**Amy Edwards**, OSB No. 012492
amy.edwards@stoel.com
**Samantha K. Sondag**, OSB No. 154244
samantha.sondag@stoel.com
**Rachelle D. Collins**, OSB No. 214059
rachelle.collins@stoel.com
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380

**Walter Fonseca**, OSB No. 136349
wfonseca@ojrc.info
**Franz Bruggemeier**, OSB No. 163533
fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503.944.2270

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| **ST. TIMOTHY'S EPISCOPAL CHURCH**, by and through **THE DIOCESE OF OREGON**, DBA **THE EPISCOPAL DIOCESE OF OREGON**, an Oregon non-profit corporation, and **REVEREND JAMES BERNARD LINDLEY**, vicar of St. Timothy's Episcopal Church, | Case No. 1:22-cv-00156-CL <br><br> PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| Plaintiffs, | |
| v. | Oral Argument Requested |
| **CITY OF BROOKINGS**, an Oregon municipal government, | |
| Defendant. | |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

I. LR 7-1 CERTIFICATION................................................................................... 1

II. MOTION .......................................................................................................... 1

III. INTRODUCTION ........................................................................................... 1

IV. STATEMENT OF MATERIAL FACTS ......................................................... 2

    A.    St. Timothy's' Feeding Ministry Is a Long-Standing Exercise of
Religious Belief. ......................................................................................... 2

    B.    St. Timothy's Increases the Number of Lunches Served Amidst the
COVID-19 Pandemic and the City Adopts Temporary Rule 2020-1. .......... 5

        1.    St. Timothy's' Neighborhood Responds to Rule 2020-1............................ 7

        2.    The City Council Holds a Workshop to Address the Petition but
Fixates on St. Timothy's' Feeding Ministry. ............................................... 8

    C.    St. Timothy's Obtains a Restaurant License from OHA per the City's
Suggestion; the City Uses That License to Inform St. Timothy's That
Its Feeding Ministry Is No Longer Permitted. ........................................... 11

    D.    The City Adopts an Ordinance Limiting "Benevolent Meal Services"
to Permit Holders Who Agree to Serve No More Than Two Days
Per Week. ................................................................................................... 11

V. STANDARD OF REVIEW ............................................................................. 14

VI. ARGUMENT................................................................................................... 15

    A.    Plaintiffs' Motion Should Be Granted Because the Ordinance Violates
RLUIPA (First Claim). .............................................................................. 15

        1.    The Ordinance Is a Land Use Regulation That Substantially Burdens
Plaintiffs' Religious Exercise. ..................................................................... 16

        2.    The City Has Not Identified Any Compelling Government Interests
Served by the Ordinance............................................................................. 21

        3.    The City Did Not Employ Least Restrictive Means. ................................. 28

    B.    Plaintiffs' Motion Should Be Granted Because the Ordinance Violates
the Free Exercise Clause (Second Claim)................................................... 30

        1.    The Ordinance Is Not Neutral..................................................................... 31

        2.    The Ordinance Is Not of General Applicability.......................................... 34

3.      The Ordinance Is Not Narrowly Tailored to Serve Compelling
        Government Interests. ........................................................................ 35

C.      Plaintiffs' Motion Should Be Granted Because the Ordinance Is Vague and
        Violates Due Process (Fourth Claim). ................................................. 35

D.      Plaintiffs' Motion Should Be Granted Because the Ordinance Violates
        Plaintiffs' Rights of Free Speech and Association (Third Claim). ....................... 38

E.      Plaintiffs' Motion Should Be Granted Because the Ordinance Violates
        Plaintiffs' Rights to Free Religious Exercise and Expression Under the
        Oregon Constitution, Article I, Sections 2, 3, and 8 (Fifth and
        Sixth Claims). ................................................................................. 40

        1.      Article I, Sections 2 and 3. ........................................................ 41

        2.      Article I, Section 8. ................................................................... 41

VII. CONCLUSION ................................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)........................................................................................25, 26

*Bloom v. City of San Diego*,
    No. 17-cv-23-24-AJB-NLS, 2018 WL 9539239 (S.D. Cal. Aug. 21, 2018) ........................37

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
    271 F.3d 1141 (9th Cir. 2001) .........................................................................36

*Chosen 300 Ministries, Inc. v. City of Phila.*,
    No. CIV.A. 12-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) ........................................17

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)........................................................................................39

*City of Hillsboro v. Purcell*,
    306 Or. 547 (1988)........................................................................................42

*City of Portland v. Tidyman*,
    306 Or. 174 (1988)........................................................................................42, 43

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986)........................................................................................39

*Congregation Etz Chaim v. City of Los Angeles*,
    No. CV10-1587 CAS EX, 2011 WL 12472550 (C.D. Cal. July 11, 2011)........................20

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 530 (1980)........................................................................................38

*Cornerstone Bible Church v. City of Hastings*,
    948 F.2d 464 (8th Cir. 1991) .........................................................................39

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*,
    218 F. Supp. 2d 1203 (C.D. Cal. 2002) ...........................................................26, 27, 28

*Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*,
    518 U.S. 727 (1996) .......................................................................................29

*DiLaura v. Twp. Of Ann Arbor*,
    112 F. App'x 445 (6th Cir. 2004) ..................................................................18, 19

*Emp. Div. v. Rogue Valley Youth for Christ*,
    307 Or. 490 (1989)........................................................................................41

*Fair Hous. Council v. Riverside Two*,
 249 F.3d 1132 (9th Cir. 2001) ....................................................................14

*Fifth Ave. Presbyterian Church v. City of New York*,
 No. 01-cv-11493, 2004 WL 2471406 (S.D.N.Y. Oct. 29, 2004).............................................19

*First Lutheran Church v. City of St. Paul*,
 326 F. Supp. 3d 745 (D. Minn. 2018)....................................................................25

*Foti v. City of Menlo Park*,
 146 F.3d 629 (9th Cir. 1998), *as amended* (July 29, 1998) ....................................35

*Fulton v. City of Phila.*,
 141 S. Ct. 1868 (2021)............................................................................ passim

*Gonzalez v. O Centro Espirita Beneficente Uniao
 do Vegetal*, 546 U.S. 418 (2006)....................................................................15

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972)....................................................................35, 36

*Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*,
 456 F.3d 978 (9th Cir. 2006) ....................................................................16, 18

*Harbor Missionary Church Corp. v. City of San Buenaventura*,
 642 F. App'x 726 (9th Cir. 2016) ....................................................................17, 20

*Hernandez v. C.I.R.*,
 490 U.S. 680 (1989)....................................................................17

*In Grace Church v. City of San Diego*,
 555 F. Supp. 2d 1126 (S.D. Cal. 2008)....................................................................21, 25, 26

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
 673 F.3d 1059 (9th Cir. 2011) ....................................................................15, 18, 19, 21

*Italian Colors Rest. v. Becerra*,
 878 F.3d 1165 (9th Cir. 2018) ....................................................................16

*State ex rel. Juvenile Dep't of Polk Cnty. v. Tucker*,
 83 Or App 330 (1987)....................................................................41

*Lukumi Babalu Aye v. City of Hialeah*,
 508 U.S. 520 (1993)............................................................................ passim

*Masonry Bldg. Owners of Or. v. Wheeler*,
 394 F. Supp. 3d 1279 (D. Or. 2019) ....................................................................27

*Mast v. County of Fillmore*,
   No. A19-1375, 2020 WL 3042114 (Minn. Ct. App. June 8, 2020), *cert.
   granted, judgment vacated sub nom. Mast*, 141 S. Ct. 2430 ................................................22

*Mast v. Fillmore Cnty., Minn.*,
   141 S. Ct. 2430 (2021) (Gorsuch, J. concurring)...............................................15, 21, 22, 23

*McLaughlin v. City of Lowell*,
   140 F. Supp. 3d 177 (D. Mass. 2015) .......................................................................................29

*Micah's Way v. City of Santa Ana*,
   No. 8:23-cv-283-DOC-KES, 2023 WL 4680804 (C.D. Cal. June 8, 2023) ....................17, 20

*Moreland v. Las Vegas Metro. Police Dep't*,
   159 F.3d 365 (9th Cir. 1998) ...................................................................................................14

*N.A.A.C.P. v. Button*,
   371 U.S. 415 (1963).................................................................................................................36

*Native Am. Council of Tribes v. Weber*,
   897 F. Supp. 2d 828 (D.S.D. 2012), *aff'd*, 750 F.3d 742 (8th Cir. 2014)..............................27

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009).................................................................................................................30

*Papachristou v. City of Jacksonville*,
   405 U.S. 156 (1972).............................................................................................................36, 37

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978).................................................................................................................27

*Sanok v. Grimes*,
   306 Or. 259 (1988)...................................................................................................................18

*Santopietro v. Howell*,
   73 F.4th 1016 (9th Cir. 2023) ..................................................................................................38

*Shakur v. Schriro*,
   514 F.3d 878 (9th Cir. 2008) ...................................................................................................17

*Shaw v. Hunt*,
   517 U.S. 899 (1996).................................................................................................................27

*Standard Oil Co. of Cal. v. Arizona*,
   738 F.2d 1021 (9th Cir. 1984) .................................................................................................31

*State v. Babson*,
   355 Or. 383 (2014)...................................................................................................................43

*State v. Caraher*,
  293 Or 741 (1982)................................................................................................40

*State v. Ciancanelli*,
  339 Or. 282 (2005)..............................................................................................42

*State v. Henry*,
  302 Or. 510 (1987)..............................................................................................40

*State v. Robertson*,
  293 Or. 402 (1982)..............................................................................................42

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981).............................................................................................31

*Turner v. Collier*,
  No. 4:19-CV-04124, 2022 WL 4734828 (S.D. Tex. Sept. 30, 2022)....................29

*United States v. Wunsch*,
  84 F.3d 1110 (9th Cir. 1996) ...............................................................................35

*Vokoun v. City of Lake Oswego*,
  189 Or. App. 499 (2003)......................................................................................18

*W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*,
  862 F. Supp. 538 (D.D.C. 1994)..........................................................................17

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989).............................................................................................39

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ...............................................................................29

*Westchester Day Sch. v. Vill. of Mamaroneck*,
  504 F.3d 338 (2d Cir. 2007).............................................................................21, 26

*Wolfson v. Brammer*,
  616 F.3d 1045 (9th Cir. 2010) .............................................................................16

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) ...............................................................................27

**Statutes**

42 U.S.C. § 1983...................................................................................................18

42 U.S.C. § 1988......................................................................................................1

42 U.S.C. § 2000cc, Religious Land Use and Institutionalized Persons Act ...................... passim

42 U.S.C. § 2000cc-2(b) ............................................................................................15

42 U.S.C. § 2000cc(2)(C) ..........................................................................................16

42 U.S.C. § 2000cc-5(5) .............................................................................................16

42 U.S.C. § 2000cc-5(7)(A) ........................................................................................17

42 U.S.C. § 2000cc-5(7)(B) ........................................................................................17

42 U.S.C. § 2000cc(a)(1) ............................................................................................15

Oregon Tort Claims Act..............................................................................................18

ORS 30.275 .................................................................................................................19

## Rules

Fed. R. Civ. P. 30(b)(6)...........................................................................................23, 30

Fed. R. Civ. P. 56 ...................................................................................................1, 14

Fed. R. Civ. P. 56(a) ...................................................................................................14

LR 7-1 ...........................................................................................................................1

## Constitutional Provisions

Oregon Constitution, art. I, § 2 .........................................................................2, 40, 41

Oregon Constitution, art. I, § 3 .........................................................................2, 40, 41

Oregon Constitution, art. I, § 8 ....................................................................2, 40, 41, 42

U.S. Constitution, First Amendment ..................................................................... passim

United States Constitution, Fourteenth Amendment ...................................................2

## Other Authorities

Bible, New Standard Revised Version...........................................................................5

Brookings Municipal Code, Chapter 17, Land Development Code ..................... passim

BMC 17.01.030.............................................................................................................3

BMC 17.20.040.B..........................................................................................................3

BMC 17.08.140 ...................................................................................................................... 3

BMC 17.08.040 .................................................................................................................... 12

BMC 17.08.124.050 ............................................................................................................ 12

BMC 17.124.050 .................................................................................................................. 17

BMC 17.20.040.N ........................................................................................................... 33, 34

BMC 17.20.040.J ................................................................................................................. 33

*Webster's Third New International Dictionary* (2022) ................................................... 36

## I.  LR 7-1 CERTIFICATION

Counsel for Plaintiffs certify that they conferred with counsel for Defendant on the issues raised in this motion.  Defendant opposes the motion.

## II.  MOTION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs St. Timothy's Episcopal Church ("St. Timothy's"), by and through The Diocese of Oregon, doing business as The Episcopal Church in Western Oregon ("Diocese"), and Reverend James Bernard Lindley ("Father Bernie," and, collectively, "Plaintiffs"), respectfully move for summary judgment in their favor, and against Defendant City of Brookings ("Defendant" or "City"), on all Plaintiffs' claims and Defendant's affirmative defenses.

In support of this Motion, Plaintiffs rely on the following Memorandum of Law, the pleadings and documents on file, the declarations and supporting exhibits of Father Bernie, the Right Reverend Diana Akiyama, Diana Zellmer, Kirk Bowyer, Isabel Mora, Sarah Kaplansky, Alan Colbert, and Samantha Sondag.  Plaintiffs seek a declaration that the Ordinance is unlawful as described herein, a permanent injunction against its enforcement, and an award of reasonable costs and attorney fees pursuant to 42 U.S.C. § 1988 and this Court's inherent authority.

## III.  INTRODUCTION

This case presents the following question: did the City of Brookings, Oregon, act unlawfully when it revised its land development code to prohibit service of the benevolent (free) meals offered by St. Timothy's and other Brookings churches, unless those churches agreed to limit service to two days per week, three hours per day?  The answer is "yes."

It is undisputed that ministering to the community, and particularly those in need, is central to Plaintiffs' religious beliefs.  Plaintiffs have exercised those beliefs through St.

Timothy's' feeding ministry for years, and for more than two days every week since 2015.  The City has not, and cannot, justify its restriction of this protected expression.  Its stated interests—which have shifted from food safety to crime to public welfare at the City's convenience—are pretextual, insufficiently particularized, and neither compelling nor legitimate as a matter of law.  The City presented and ostensibly relied on misleading and irrelevant information in adopting the subject ordinance, and there is no genuine dispute that its motivation arose from a belief that St. Timothy's was not acting like a "traditional" church.  The record shows that City officials designed the ordinance not only to restrict Plaintiffs' feeding ministry, but to create a path to impose new conditions on activities that the City deemed insufficiently church-like.

Neither federal nor state law condones the City's actions.  The ordinance is a content-based land use regulation that substantially infringes upon Plaintiffs' rights to free religious exercise, assembly, and speech.  It is untethered to any legitimate government interests, and its inherently vague terms fail to provide adequate notice of prohibited conduct and encourage arbitrary enforcement.   The City has violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"), the First and Fourteenth Amendments of the United States Constitution, and sections 2, 3, and 8 of Article I of the Oregon Constitution.  Plaintiffs respectfully ask this Court to enter summary judgment in their favor, declare the ordinance unlawful, and permanently enjoin its enforcement so that they may continue serving their brothers and sisters consistent with their Christian faith.

## IV.  STATEMENT OF MATERIAL FACTS

**A.** **St. Timothy's' Feeding Ministry Is a Long-Standing Exercise of Religious Belief.**

In or around 1945, St. Timothy's, a mission church of the Diocese, organized in Brookings, Oregon.  *See* Declaration of the Right Reverend Diana Akiyama ("Akiyama Decl.")

¶ 2, Ex. 1.  In 1953, the Diocese purchased the property where St. Timothy's is currently located: 401 Fir Street.  *Id.* ¶ 3, Ex. 2.  More than three decades later, in 1989, the City of Brookings adopted its Land Development Code and zoned St. Timothy's neighborhood as an R-1 (residential) district.  BMC 17.01.030.  Churches are permitted as conditional uses in residential zones.  BMC 17.20.040(B).  St. Timothy's specifically operates as a "nonconforming use" or "de facto conditional use" because it pre-existed the Land Development Code.  BMC 17.08.140; *see also* Deposition of Janell Howard ("Howard Dep."), Ex. 3 at 2.[1]

Father Bernie began attending St. Timothy's in 1973, when he was six years old.  Lindley Decl. ¶ 2.  He observed the vicars regularly administering alms to the needy, consistent with Christian teaching and Episcopalian canons.  *Id*.  As Father Bernie prepared to leave for college in 1985, he watched St. Timothy's open a food bank in its basement, a program that the church hosted until approximately 2006.  Deposition of Reverend James Bernard Lindley ("Lindley Dep.") 15:3-6, 82:1-14;[2] Lindley Decl. ¶ 3.

In 2009, a year after Father Bernie became vicar, St. Timothy's began offering a free lunchtime meal at the church.  Lindley Dep. 48:17-20, 71:24-72:2; Deposition of Ronald Hedenskog ("Hedenskog Dep.") 15:7-11).[3]  Several other Brookings-area churches also began serving free lunchtime meals on other days of the week around this time.  Lindley Decl. ¶¶ 4-5.

---

[1] Excerpts and Exhibits from the Howard Deposition are attached as **Exhibit 1** to the Declaration of Samantha Sondag ("Sondag Decl." or "Sondag Declaration").

[2] Excerpts from the Lindley Deposition are attached as **Exhibit 2** to the Sondag Declaration.

[3] Excerpts and Exhibits from the Hedenskog Deposition are attached as **Exhibit 3** to the Sondag Declaration.  Some evidence indicates that St. Timothy's was serving meals two days per week in 2009.  *See* Howard Dep. Ex. 3 at 3.  For purposes of summary judgment, it does not matter whether it was one day or two days.

The collective goal of these churches was to make a free meal available every day of the week. *Id.* ¶ 5.  The churches called the rotating meal program the "Community Kitchen."  *Id.*

Although open to all, the meals served at St. Timothy's and other Brookings churches are particularly important resources for local homeless and low-income individuals because the City offers few, if any, services for these residents.  Lindley Decl. ¶ 4; Hedenskog Dep. 14:20-21; Howard Dep. 27:5-9; Deposition of Anthony Baron ("Baron Dep.") 49:22-50:6.[4]  In 2015, following an observable increase in people experiencing homelessness in Brookings, St. Timothy's began serving meals three to four times per week.  Hedenskog Dep. 13:4-10, 15:7-14; Lindley Decl. ¶ 6.  St. Timothy's has served these meals from 12:00 to 1:00 p.m. on all days but Sunday, when meals are offered from 3:00 to 4:00 p.m.  Lindley Decl. ¶ 7.  St. Timothy's is the only church that has served more than two meals per week since the initiation of the Community Kitchen.  *Id.*

St. Timothy's' feeding ministry is in keeping with core Christian beliefs that guide the Episcopal church: feed the hungry, respect the dignity of every human being, and build community.  *Id.* ¶ 2; Lindley Dep. 150:11-153:13; Deposition of the Right Reverend Diana D. Akiyama ("Akiyama Dep.") 39:24-40:7 (members of the Episcopal Church "have been given a mandate by Jesus Christ as stated in the scriptures to feed the hungry, clothe the naked, to comfort the afflicted"; indeed, this is "at the heart of . . . our Christian call").[5]  The feeding ministry at St. Timothy's provides a space where people can gather to pray, converse, and serve those who might otherwise go hungry.  As explained in the Book of James:

---

[4] Excerpts and Exhibits from the Baron Depositions are attached as **Exhibit 4** to the Sondag Declaration.

[5] Excerpts from the Akiyama Deposition are attached as **Exhibit 5** to the Sondag Declaration.

> What good is it . . . if you say you have faith but do not have works? Can faith
> save you? If a brother or sister is naked and lacks daily food, and one of you says
> to them, "Go in peace; keep warm and eat your fill," and yet you do not supply
> their bodily needs, what is the good of that? So faith by itself, if it has no works,
> is dead.

James 2:14-17; *see also, e.g.,* Isaiah 58:6-7 (directing believers to "share [their] bread with the

hungry"); Matthew 14:14-21 ("Jesus replied, 'They need not go away; you give them something

to eat.'"); Matthew 18:20 ("For where two or three are gathered in my name, I am there among

them."); Matthew 25:35-45 ("For I was hungry and you gave me food" and "[t]ruly I tell you, just

as you did it to one of the least of these who are members of my family, you did it to me.");

Proverbs 22:9 ("Those who are generous are blessed, for they share their bread with the poor.");

*see* Lindley Decl. ¶ 9, Ex. 1.  As Father Bernie testified:

> [I]t's my firmly held belief, and not just mine, but that of my religious tradition . .
> . that when Jesus said, "Whatever you do unto the least of these" he meant it and
> hoped that we would do – not hoped, but made it clear that his intention was that
> we would feed, clothe, welcome, heal, based on – and that would be like the latter
> half of Matthew Chapter 25. And then . . . I look toward the epistle that James
> wrote toward the end of the New Testament where he says, "Faith without works
> is dead[.] . . . [I]n the Book of Common Prayer we're instructed in our – in our
> baptismal covenant to respect the dignity of every human being and to – and then
> – and then also, you know, the first  commandment is this, that you love the Lord
> your God with all your heart, soul, strength, and mind, and the second is that you
> love your neighbor as yourself, and treat your neighbor as you would your[self].

Lindley Dep. 150:11-153:13.

In short, St. Timothy's' feeding ministry is not merely adjacent to St. Timothy's' worship;

it *is* an act of worship and part of St. Timothy's' use of the property as a church.  Lindley Decl.

¶ 4; Zellmer Decl. ¶¶ 2, 3, 7; Kaplansky Decl. ¶¶ 8, 9.

**B.    St. Timothy's Increases the Number of Lunches Served Amidst the COVID-19
Pandemic and the City Adopts Temporary Rule 2020-1.**

During the peak of the COVID-19 pandemic, nearly all churches except St. Timothy's

stopped offering meals.  Lindley Decl. ¶ 8; Howard Dep. 83:12-16.  Heeding Christian scripture,

St. Timothy's responded by increasing its lunch service in an effort to fill the resulting gap.  From approximately April 2020 through early 2022, St. Timothy's served lunches five to six times per week. Lindley Decl. ¶ 8.

Meanwhile, the COVID-19 pandemic revived concerns regarding the lack of housing in Brookings and, in early April 2020, the City enacted Temporary Rule 2020-1 ("Rule 2020-1"). Sondag Decl. Ex. 8 (April 6, 2020, meeting minutes); Hedenskog Dep. Ex. 24 at 8.  Adopted unanimously by the City Council, Rule 2020-1 allowed religious institutions to offer limited "overnight camping space on institution property to homeless persons"—conduct otherwise prohibited by the BMC.  Hedenskog Dep. Ex. 24 at 8.  Rule 2020-1 was drafted to expire when Governor Brown's "Stay Home, Stay Safe" order terminated and was contingent on religious institutions providing campers access to sanitary facilities.  *Id.* at 8-9.  St. Timothy's was the only institution in Brookings to apply for (and obtain) a Rule 2020-1 permit.  Howard Dep. 51:12-16.

The Rule 2020-1 program proved challenging to manage.  Lindley Dep. 131:22-132:11. Some of the people who slept on St. Timothy's property "had untreated mental illnesses" in need of services unavailable in Brookings.  *Id.* 132:1-11.  There were behavioral issues and loud noises.  *Id.*  Two individuals assaulted each other.  *Id.* 132:1-11, 160:17-24.  In addition, government officials transported at least one person struggling with medical and/or mental health issues to the church, where she remained until Father Bernie checked her into a hospital.  Sondag Decl., Ex. 09; Answer (ECF No. 10) ¶ 25.

On or around March 8, 2021, St. Timothy's enrolled in the newly created Brookings Property Watch program, giving Brookings police the right to trespass any non-approved individuals who entered the property after 6:00 p.m. Lindley Decl. ¶ 10; *see* Sondag Decl., Ex. 10.  By then, however, St. Timothy's' neighbors had tired of Rule 2020-1.

1.      **St. Timothy's' Neighborhood Responds to Rule 2020-1.**

On March 19, 2021, a neighbor of St. Timothy's sent City Councilor Ed Schreiber a proposition paper titled "Peace-of-Mind for a Neighborhood" and a supporting PowerPoint titled "St. Timothy's – Church or Homeless Shelter?"  Howard Dep. Ex. 15; Schrieber Dep. 28:19-29:16).  The paper's objective is clear in the first sentence: "This proposal urges the City of Brooking[s] to reconsider allowing vagrants to continue to live at St. Timothy's church with no supervision for matters concerning public safety and the personal expenses of the homeowners living next to the church."  Howard Dep. Ex. 15 at 11.  Neither the paper nor the PowerPoint discussed meal service at St. Timothy's.  *Id.*

On or around April 10, 2021, Mr. Usry gathered 29 signatures on a "Petition to Remove Homeless from St. Timothy Church" (the "Petition").  Howard Dep. 37:24-38:19, Dep. Ex. 3 at 7.  The Petition asked the City of Brookings "to reconsider allowing vagrants to continue to live and congregate at St. Timothy's Church," citing disturbances over "the past six months."  Howard Dep. Ex. 3 at 7.  The "action petitioned for" was to "remove the homeless encampment and prevent the congregation of vagrants or undesirables at St. Timothy Church."  *Id.*  The Petition was presented at the April 12, 2021, City Council meeting.  Howard Dep. 38:13-19. At that meeting, Mr. Usry told the Council:

> The community's been dealing with -- or it [is] rather -- dealing with a lot of issues regarding the homeless individuals staying at the church permanently for what seems like longer than three months.  I understand that there's rules put in place having three vehicles every night, but you know, it's between the three vehicles and people just showing up in the middle of the night, 8:30 -- or 11:30 past and opening and closing doors, people staying for five minutes and leaving past certain hours. It's just very -- very suspicious behavior that I've noticed.

Sondag Decl., Ex. 11 (April 12, 2021, Meeting Transcript).

At the same meeting, the City Council discussed the advisability of a Brookings non-profit seeking a Project Turnkey grant from the Oregon Community Foundation ("OCF"). Hedenskog Dep. Ex. 21.  The grant would have allowed the non-profit to acquire a hotel "for use as non-congregate shelter for people experiencing homelessness or at-risk of homelessness."  *Id.* A personal letter of support for the project from then-Mayor Jake Pieper prompted the discussion.  *Id.*  The Council concluded it did not support the grant and voted to require Mayor Pieper to sign a letter stating as much to remove any confusion caused by his personal letter of support.  Hedenskog Dep. Ex. 21.  Mayor Pieper resigned the next day.  Sondag Decl. Ex. 12 at 3 (April 19, 2021, Agenda).

### 2.    The City Council Holds a Workshop to Address the Petition but Fixates on St. Timothy's' Feeding Ministry.

The City Council held a workshop on June 7, 2021, to discuss a response to the Petition. Howard Dep. 38:20-23, Dep. Ex. 3 at 2.  To "address neighborhood concerns," the agenda noted that the City may need to "[r]evisit and potentially rescind temporary rule 2020-1[.]"  Howard Dep. Ex. 3 at 4.  This happened three weeks later, when the City allowed Rule 2020-1 to expire effective June 30, 2021.  Howard Dep. 52:12-25, Dep. Ex. 4.  Since then, St. Timothy's has continued to participate in the Property Watch Program and regularly invites a Brookings Police Department community resources officer to its property.  Hedenskog Dep. 50:17-21, 109:4-12; Lindley Dep. 156:10-157:7.

Although Rule 2020-1 was the locus of the "neighborhood concerns" the City Council allegedly sought to address, City officials continued to push forward with another item listed in the agenda: St. Timothy's' Community Kitchen.  Indeed, even though the Petition and related documents made no mention of St. Timothy's' feeding ministry, the agenda contained significant information about it.  This included "statistics" allegedly showing that "[s]ince the opening of

the soup kitchen at St. Timothy's in 2009[,] there has been a significant increase in calls for service through dispatch of the Brookings Police Department by comparison to other churches in residential neighborhoods." Howard Dep. Ex. 3 at 3. The agenda reported that City staff had concluded that the church was "operating a commercial kitchen without a permit." *Id.*

The staff's conclusion came as a surprise to Father Bernie and St. Timothy's parishioners; after all, they had operated the feeding ministry for years, including while Councilor-turned-Mayor Ron Hedenskog was the kitchen manager. *See* Hedenskog Dep. 11:13-16; Lindley Dep. 112:17-113:7, 115:2-11. Anxious to keep the kitchen open, St. Timothy's immediately began communicating with the Oregon Health Authority ("OHA") about licensing. On June 15, 2021, St. Timothy's submitted a "food service plan review application" and, on June 25, 2021, an application for a restaurant/commercial kitchen license. Lindley Decl. ¶ 11.

Unbeknownst to Plaintiffs, City officials had begun discussing St. Timothy's kitchen months earlier as a possible means to limit the church's ministries. On July 28, 2020, nearly a year before the Petition was circulated, Mr. Hedenskog emailed Ms. Howard that he had heard from a church volunteer that St. Timothy's was serving lunch six days a week and that its showers were "being used to the max"—apparently news that caused him to believe St. Timothy's was operating as a "restaurant" or "mission," putting it beyond the scope of its "church CUP." Hedenskog Dep. 57:8-58:7, Dep. Ex. 25. Two weeks later, Mr. Baron, Ms. Howard, and members of the Brookings Police Department corresponded about ways to "challenge . . . St. Tim's de facto Conditional Use Permit," including by re-categorizing them as a "restaurant." Baron Dep. 29:8-20, Dep. Ex. 36. Such re-classification would allow the City to place "'conditions'" on St. Timothy's religious ministry. *Id.* 38:17-39:10, Dep. Ex. 37. Indeed,

in November 2020, Mr. Baron emailed to a Brookings resident text that she "should address" in a

petition about St. Timothy's:

> I, undersigned, a citizen[] of the City of Brookings, challenge the conditional use
> permit for St. Timothy's Episcopal Church in a residential zone. The services St.
> Timothy's is providing to the homeless and transients goes well beyond what is
> allowed under a conditional use permit for a church in an R-1-6 residential zone.
> Without regulation over the past several years St. Timothy's has become a blight
> in our neighborhood and in our community. I am requesting the City of Brookings
> review the validity of St. Timothy's conditional use permit and require them to
> comply with any and all land use regulations as set forth in Chapter 17 Land
> Development Code of the Brookings Municipal Code.

Baron Dep. 56:21-57:22, Dep. Ex. 43.

Following these internal discussions, the City's counsel sent an email to the Curry County

Public Health Department in February 2021 requesting that the Department "review the activities"

of St. Timothy's and three other churches because the City believed that one or more of them was

"subject to state and county food sanitation requirements as a temporary seasonal or permanent

restaurant." Sondag Decl. Ex. 13. The City's counsel referenced an earlier discussion with the

Department concerning St. Timothy's and explained that, while "[t]he City appreciates the positive

benefits [St. Timothy's'] meal service provides to the community, [it] is concerned about possible

unintended public health impacts." *Id.*

The same attorney contacted OHA in June 2021 to express the City's continued interest in

applying requirements for "benevolent restaurants to a church in the City of Brookings." Sondag

Decl., Ex. 14. In these and other communications with OHA, the City's counsel represented that

the City was simply looking to ensure that food provided to the public "is safe and . . . complies

with all state requirements." *Id.*, Ex. 15.

C.    **St. Timothy's Obtains a Restaurant License from OHA per the City's Suggestion; the City Uses That License to Inform St. Timothy's That Its Feeding Ministry Is No Longer Permitted.**

St. Timothy's' OHA application was approved on June 30, 2021. Lindley Decl. ¶ 12, Ex. 2. St. Timothy's' senior warden, Diana Zellmer, celebrated the church's new licensed status in a July 7, 2021, Facebook post, explaining that "we are now a commercial Kitchen for our disenfranchised friends." Howard Dep. 75:7-14, Dep. Ex. 11. Despite the City's representations that it had *wanted* St. Timothy's to acquire a commercial kitchen license, City officials did not respond to the news with relief; instead, they used the license to attempt to shutter St. Timothy's' feeding ministry. Ms. Howard forwarded the Facebook post to Mr. Baron, stating that if St. Timothy's had in fact "pass[ed] inspection," then it was time to shut them down: "***we need a letter to issue ASAP that says a restaurant is not allowed in [a] residential zone***." Howard Dep. Ex. 11 (emphasis added). Two weeks later, on July 20, 2021, Mr. Baron emailed with an OHA representative about "potentially correcting [St. Timothy's'] classification to a Restaurant[.]" Baron Dep. 90:4-91:4, Dep. Ex. 46. Then, on July 29, 2021, the City sent notices to St. Timothy's and four other Brookings churches advising them that their kitchens were now "commercial" and the congregations needed to relocate them to non-residential zones or otherwise explore establishing "limits on the frequency and volume of potential meal services." Howard Dep. 59:15-60:13, 63:19-64:8, Dep. Exs. 6 at 14, 7.

D.    **The City Adopts an Ordinance Limiting "Benevolent Meal Services" to Permit Holders Who Agree to Serve No More Than Two Days Per Week.**

St. Timothy's did not relocate its kitchen in response to the July 29 notice. Instead, Plaintiffs sent a letter to the City explaining its concerns with the City's implausible new interpretation that the Land Development Code prohibited churches in residential zones from serving meals because OHA's licensing had transformed them into restaurants. Lindley Decl.

¶ 13, Ex. 3.  Those concerns went unheeded, and the City amended the BMC to codify its new

interpretation.  On October 25, 2021, the City Council, at staff's recommendation, unanimously

adopted Ordinance 21-O-795, enacted as BMC 17.08.020 (B Terms), 17.20.040.V, 17.24.040.W,

17.28.040.U, and 17.124.050 (the "Ordinance").  Howard Dep. Exs. 14, 20.

      The Ordinance added "benevolent meal service" as a new conditional use in all

residential zones (R-1, R-2, and R-3).[6]  "Benevolent meal service" is defined as "a periodic food

service operation that provides food to the public without charge."  *Id.*, Dep. Ex. 14 at 5; BMC

17.08.020.  The Ordinance allows "charitable organization[s]" that obtain a conditional use

permit ("CUP") to serve benevolent meals "up to two days per week between the hours of 9 am

and 5 pm, with no meal service lasting more than three hours per day."  Howard Dep. Ex. 14 at

5-6; BMC 17.08.040, 17.08.124.050.  The application for a benevolent meal services CUP

requires the applicant to "agree to comply with the . . . provisions of [BMC] 17.124.050,"

including that they will only serve "meals to the public up to two days per week."  *See, e.g.,*

Sondag Decl. Ex. 16.  Churches were afforded a three-month grace period to apply for the CUP.

Howard Dep. Ex. 20 at 2.

      The Ordinance was described in a Planning Commission Staff Report as a "method for

allowing benevolent meal services in churches, in a residential zone, under a Conditional Use

Permit."  Howard Dep. 78:21-79:7, Dep. Ex. 12 at 3.  The Staff Report explained that the

Ordinance was necessary because "OHA has classified the community kitchens located at

St. Timothy's Episcopal Church [and other churches] as restaurants" and "[t]he BMC does not

allow 'restaurants'" in residential districts.  *Id*.  That report was authored by Mr. Baron, who just

---

[6] All Brookings churches are located in residential zones. *See, e.g.*, Howard Dep. Ex. 3 at 3.

a few months earlier had encouraged OHA to "correct" St. Timothy's' "classification to a

Restaurant[.]" Baron Dep. Ex. 46.

Plaintiffs could not sign a CUP application agreeing to limit their feeding ministry while

also adhering to their sincerely held religious belief to feed the hungry and care for those in need.

On November 30, 2021, the Diocese sent a letter advising the City that the Ordinance violated

the Oregon and federal constitutions, as well as RLUIPA, and notified the City of its intent to sue

should the City not repeal or amend the Ordinance.  Akiyama Decl., ¶ 4, Ex. 3. The City did not

respond to that letter.  *Id.*  Accordingly, on January 28, 2022, Plaintiffs filed this lawsuit seeking

a declaration that the Ordinance is unlawful and an injunction against its enforcement.

**E.    The City Serves St. Timothy's with a Notice of Abatement and Demands
St. Timothy's Cease Its Feeding Ministry and All "Social Services."**

For more than a year, the parties progressed through discovery.  St. Timothy's continued

serving meals three to four days a week and the City refrained from issuing a notice of violation

to St. Timothy's.  That changed on April 14, 2023, when the City delivered a "Notice of

Abatement" to St. Timothy's. The Notice stated in pertinent part:

> St. Timothy's is operating a Benevolent Meal Service without a conditional use
> permit in addition to a variety of other social services, including an outreach
> clinic, a day program, and an advocacy program in violation of 17.01.040
> Compliance with code provisions in the Brookings Municipal Code (BMC).
> . . . .
>
> You are hereby directed to abate this violation by applying for a Conditional Use
> Permit within ten (10) days from the date of receipt of this notice. Failure to abate
> the violation may warrant issuance of a citation and imposition of a civil penalty
> of up to $720.00. Each day's violation constitutes a separate offense. In addition,
> the City may abate the violation and the cost of the abatement will be charged to
> you.

Howard Dep. 106:6-107:22, Dep. Ex. 18.

Before filing a motion for temporary restraining order, St. Timothy's requested that the City refrain from enforcing and assessing fines pursuant to the Notice of Abatement during the pendency of this case. The City agreed to do so until a "summary judgment decision" with respect to the "benevolent meal services," but not with respect to St. Timothy's "other social services." Sondag Decl. ¶ 18. Thus, to avoid daily $720 fines for, among other things, opening its doors to the public on Mondays, Wednesdays, and Fridays, St. Timothy's filed with the City objections to and an appeal of the notice as it pertained to St. Timothy's' other "social services." *See, e.g., id.* Ex. 17 at 12-55 (June 27, 2023, Agenda Packet). Since then, St. Timothy's has been forced to defend its charitable ministries as "church uses" in a parallel proceeding. *Id.* As of the date of this Motion, the City Planning Commission has denied St. Timothy's objections, and the matter is pending before the City Council. *Id.* ¶ 20.

## V. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden, with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## VI.  ARGUMENT

A.    **Plaintiffs' Motion Should Be Granted Because the Ordinance Violates RLUIPA (First Claim).**

RLUIPA prohibits the government from implementing a land use regulation that imposes a substantial burden on religious exercise unless the government can show that it is the least restrictive means of achieving a compelling governmental interest.  42 U.S.C. § 2000cc(a)(1). RLUIPA provides for strict scrutiny of even generally applicable, facially neutral zoning laws "pursuant to which governments may make 'individualized assessments' of the property at issue."  *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066 (9th Cir. 2011) (citations omitted).

A plaintiff has the initial task of proving that a challenged regulation substantially burdens its religious exercise.  Then the burden shifts to the government to prove, under a strict scrutiny analysis, that its action was the least restrictive means of furthering a compelling interest. *Id.* at 1066-67; 42 U.S.C. § 2000cc-2(b).  The government cannot satisfy its burden by "rely[ing] on 'broadly formulated' governmental interests"; rather, strict scrutiny requires "specific application" of the asserted interest and regulation to the community at hand.  *Mast v. Fillmore Cnty., Minn.*, 141 S. Ct. 2430, 2432 (2021) (Gorsuch, J. concurring) (citing *Fulton v. City of Phila.,* 141 S. Ct. 1868, 1881 (2021); *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)).

Here, Plaintiffs are entitled to summary judgment on their RLUIPA claim because there is no genuine dispute that (1) the feeding ministry is an exercise of Plaintiffs' religion that is substantially burdened by the Ordinance; and (2) the City has not and cannot articulate a

"compelling government interest" served by restricting that exercise.[7]  Finally, even if the City

*had* identified a bona-fide compelling interest served by its actions, the Ordinance is most

certainly not the least restrictive means to achieve it.

      **1.**      **The Ordinance Is a Land Use Regulation That Substantially Burdens Plaintiffs' Religious Exercise.**

            **a.**      **The Ordinance Is a Land Use Regulation.**

Under RLUIPA, a "land use regulation" is "a zoning or landmarking law, or the

application of such a law, that limits or restricts a claimant's use or development of land

(including a structure affixed to land), if the claimant has an ownership, leasehold, easement,

servitude, or other property interest in the regulated land or a contract or option to acquire such

an interest."  42 U.S.C. § 2000cc-5(5).  "RLUIPA applies when the government may take into

account the particular details of an applicant's proposed use of land when deciding to permit or

deny that use."  *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 986 (9th

Cir. 2006) (citing 42 U.S.C. § 2000cc(2)(C)).

As a matter of law, the Ordinance is a "land use regulation" subject to RLUIPA.  It is a

zoning law that on its face and in its application limits Plaintiffs' use of the land at 401 Fir Street,

including the church affixed to that property.  Like the Brookings Land Development Code more

generally, the Ordinance permits the City to take into account particular details of an applicant's

---

[7] In its Fourth Affirmative Defense, the City erroneously contends that Plaintiffs' claims are not ripe.  Answer (ECF No. 10) ¶ 103.  A claim is ripe if there is a credible threat of enforcement.  *Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018).  "[I]n the context of First Amendment speech, a threat of enforcement may be inherent in the challenged statute, sufficient to meet the constitutional component of the ripeness inquiry."  *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010).  Here, the City contends the Ordinance applies to St. Timothy's and has *already* issued a notice of enforcement threatening $720/day fines if St. Timothy's continues to serve "benevolent meals."  Those fines are stayed only temporarily per the agreement of the parties.  Sondag Decl. ¶ 18.  A $720/day fine will chill St. Timothy's' constitutionally protected activity.  Accordingly, summary judgment should enter against the City's Fourth Affirmative Defense.

use of land, including the days and times of the week that a church provides "benevolent meal services."  BMC 17.124.050.

      **b.**      **The Feeding Ministry Is Religious Exercise.**

RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A). "Religious exercise" is defined broadly because "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"  *Shakur v. Schriro,* 514 F.3d 878, 884 (9th Cir. 2008) (quoting *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)).  "The use . . . of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses . . . the property for that purpose."  42 U.S.C. § 2000cc-5(7)(B).

There is no genuine dispute that St. Timothy's' feeding ministry is "religious exercise" under RLUIPA.  Courts across the country have recognized that ministering to the poor is an exercise of a sincerely held "religious duty to feed the hungry and clothe the naked."  *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 729 (9th Cir. 2016) (discussing church's "homeless ministry"); *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 544, 546 (D.D.C. 1994) (ministering to poor is "in every respect" "religious activity and a form of worship" and "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions"); *Chosen 300 Ministries, Inc. v. City of Phila.*, No. CIV.A. 12-3159, 2012 WL 3235317, at *17 (E.D. Pa. Aug. 9, 2012) ("Acts of charity are central to Christian worship."); *see also Micah's Way v. City of Santa Ana*, No. 8:23-cv-283-DOC-KES, 2023 WL 4680804, at *5 (C.D. Cal. June 8, 2023) (faith-based organization

plausibly alleged that "food distribution activities are religious exercise" because such "charitable activity [was] pursuant to the teachings and words of Jesus Christ").

The City Manager, Mayor, Council President, and Public Works Director all testified they had no reason to question the validity of Plaintiffs' religious beliefs.  Howard Dep. 64:17-65:16; Hedenskog Dep. 45:15-46:11; Deposition of Ed Schreiber [8] ("Schreiber Dep.") 53:16-25; Baron Dep. 15:8-11.  And, even if the City did harbor any doubts, it is not for the Court to "inquire into the truth or falsity of stated religious beliefs."  *Int'l Church*, 673 F.3d at 1069.

### c.    The Ordinance Substantially Burdens Plaintiffs' Religious Exercise.

A substantial burden is one that is "'oppressive to a significantly great extent.'"  *Guru Nanak*, 456 F.3d at 988 n.12 (citation omitted).  "A substantial burden exists where the governmental authority puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Int'l Church*, 673 F.3d at 1067 (internal quotation marks and citation omitted).  Restrictions that "substantially limit" an intended religious use of a property create a substantial burden under RLUIPA.  *DiLaura v. Twp. Of Ann Arbor*, 112 F. App'x 445, 446 (6th Cir. 2004).

Forcing St. Timothy's to operate its feeding ministry from church property for only two days per week (with a permit), or not at all (without one) is a substantial burden on Plaintiffs' religious exercise.[9]  As detailed above, Plaintiffs' faith compels them to feed the hungry when

---

[8] Excerpts from the Schreiber Deposition are attached as **Exhibit 6** to the Sondag Declaration.

[9] In its Second Affirmative Defense, the City erroneously contends that the Oregon Tort Claims Act ("OTCA")  bars Plaintiffs' claims.  Answer (ECF No. 10) ¶ 101.  The OTCA is not applicable here because this is not a tort action seeking damages.  *See, e.g.*, *Vokoun v. City of Lake Oswego*, 189 Or. App. 499, 510-11 (2003) (claim that is not a tort is not subject to OTCA); *Sanok v. Grimes*, 306 Or. 259, 262 (1988) (OTCA notice requirements do not apply to constitutional claims based on 42 U.S.C. § 1983).  Regardless, the City had ample notice of

the need exists.  It is undisputed that without St. Timothy's' feeding ministry operating more than two days per week, there would be several days each week when no free meal would be available to people in need in Brookings.  *See* Lindley Decl., ¶ 8.  The Ordinance thus forces Plaintiffs to choose between acting in accordance with their faith or facing a fine of $720 per day.  It is clear that the Ordinance thus puts "'substantial pressure'" on Plaintiffs "'to modify [their] behavior and to violate [their] beliefs.'"  *Int'l Church,* 673 F.3d at 1067 (citation omitted).

Courts in other jurisdictions have held that similar regulations limiting no-cost meals and homeless outreach substantially burden religious exercise.  In Michigan, a township's refusal to permit a religious ministry to run a religious retreat for "contemplative prayer" unless they operated as a bed and breakfast and charged guests for meals violated RLUIPA.  *DiLaura,* 112 F. App'x at 446 (holding that limiting plaintiff to bed and breakfast permit "requir[ing] payment" and limiting meals to "'breakfast, snacks, coffee and tea service' . . . effectively barred the plaintiffs from using the property in the exercise of their religion" (citation omitted)).  In New York, a court stated that it was "hard to see how" the city could dispute that dispersing homeless individuals sleeping on a church's outdoor property "substantially burdened" that church's expression of its religious belief.  *Fifth Ave. Presbyterian Church v. City of New York,* No. 01-cv-11493, 2004 WL 2471406, at *4 (S.D.N.Y. Oct. 29, 2004) (analyzing "substantial burden" under First Amendment).  In June of this year, the Central District of California held that where a city has represented "that continued distribution of food will be met with 'issuance of administrative fines,'" it has "plausibly put pressure on [the plaintiff] to modify its behavior and

---

Plaintiffs' intent to sue (*see, e.g.*, Akiyama Decl. Ex. 3), and the action was commenced within the applicable period of time under ORS 30.275.  The City's <u>Second Affirmative Defense</u> fails as a matter of law.  Answer (ECF No. 10) ¶ 101.

Page 19  -   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

violate its beliefs by abandoning its charitable practices." *Micah's Way*, 2023 WL 4680804, at
*5 (citation omitted) (denying motion to dismiss).

Plaintiffs expect the City to argue that its actions do not impose a substantial burden
because St. Timothy's could try to relocate services from its current property to one in a
commercial zone. Plaintiffs are aware of no authority supporting the City's position that St.
Timothy's should pay to rent or purchase a commercial restaurant space to serve the same meals
that it has provided for years on its existing property. *See, e.g., Harbor Missionary Church
Corp.*, 642 F. App'x at 729 (rejecting government's argument that forcing church to relocate
homeless ministry was not substantial burden because moving would require fundraising and
because church's ministry could not "be divided piecemeal" when "keeping its homeless
ministry as a whole at the same location" was important to church); *Congregation Etz Chaim v.
City of Los Angeles*, No. CV10-1587 CAS EX, 2011 WL 12472550, at *6 (C.D. Cal. July 11,
2011) ("The Court does not find compelling the City's argument that the possibility that the
Congregation could find an alternative location precludes a finding of substantial burden").

Even if requiring St. Timothy's to relocate its services from the property it has occupied
and operated as a church for approximately seven decades was not itself a substantial burden, the
absence of alternative properties would be. Mayor Hedenskog was the manager of St. Timothy's
kitchen program from 2009 to 2018 and unsuccessfully attempted to find a central kitchen
location where all the churches could share preparation of meals. Hedenskog Dep. 12:1-3;
Lindley Dep. 112:17-113:18, 114:23-115:11; Sondag Decl., Ex. 18 (August 30, 2021 meeting
minutes) 59:17-60:1. In 2021, the City considered but was unable to effectuate a purchase of
property in a commercial zone to "add[] a building that could be used for meal services."
Hedenskog Dep. 79:16-82:1.

There is no genuine dispute of material fact that the Ordinance substantially burdens Plaintiffs' religious exercise.

### 2.    The City Has Not Identified Any Compelling Government Interests Served by the Ordinance.

Because Plaintiffs have presented a *prima facie* case that the Ordinance substantially burdens their religious exercise, the burden shifts to the City to prove that the Ordinance is the least restrictive means of satisfying compelling government interests.  The City falters at step one—it has not identified, and cannot identify, any compelling interest served by the Ordinance.

The City has asserted two categories of broad justification for the Ordinance: (1) "protect[ing] the public welfare, maintain[ing] peace and order, and prevent[ing] crime"; and (2) facilitating the provision of "benevolent meal services" in residential areas, which were "not allowed" under the BMC prior to adopting the Ordinance.  Sondag Decl., Ex. 19 (Responses to Interrogatories 7, 9, 10).  Neither is a compelling government interest under RLUIPA.

### a.    The Asserted Interests Are Not Compelling Because They Are Not Specific to the Ordinance and the Religious Exercise It Limits.

Only "'interests of the highest order'" are considered compelling governmental interests. *Int'l Church*, 673 F.3d at 1071 (quoting *In Grace Church v. City of San Diego*, 555 F. Supp. 2d 1126 (S.D. Cal. 2008)).  "'[B]roadly formulated interests'" do not withstand strict scrutiny. *Fulton*, 141 S. Ct. at 1881 (citation omitted); *Mast*, 141 S. Ct. at 2430.  Rather, the government "must show 'a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general.'"  *Grace Church*, 555 F. Supp. 2d at 1140 (quoting *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007)).

A pair of recent Supreme Court decisions, *Fulton* and *Mast,* are instructive with respect to governmental interests.  In *Fulton,* the city of Philadelphia declined to renew its contract with a Catholic foster agency that did not certify same-sex couples as foster parents in violation of a

non-discrimination provision in the existing contract and Philadelphia's Fair Practices

Ordinance. 141 S. Ct. at 1875. The agency brought First Amendment claims and sought a

preliminary injunction. *Id.* The district court and Third Circuit found for the city. *Id.* at 1876.

In an opinion delivered by the Chief Justice and joined by Justices Breyer, Sotomayor,

Kagan, Kavanaugh, and Barrett, the Supreme Court reversed and remanded. *Id.* at 1882. As

particularly relevant here, the Court closely considered Philadelphia's claimed interests of

"maximizing the number of foster parents" and "protecting the City from liability." *Id.* at 1881.

The Court held that these interests were asserted at an impermissibly "high level of generality,"

and the requisite inquiry concerned whether Philadelphia had such interests specifically when it

denied the agency an exception to its non-discrimination policies. *Id.* When "properly

narrowed" in this fashion, "the City's asserted interests [were] insufficient." *Id.* "If anything,

including [the agency] in the program seems likely to increase, not reduce, the number of

available foster parents," and Philadelphia' stated concern about liability was mere speculation,

"insufficient to satisfy strict scrutiny." *Id*. at 1881-82

In *Mast*, the Court vacated a judgment entered against petitioners and remanded the case

"for further consideration in light of *Fulton*." 141 S. Ct. at 2430. *Mast* concerned a Minnesota

ordinance that required installation of modern septic systems under threat of fines and penalties.

*Id.* at 2431 (Gorsuch, J., concurring). An Amish community whose "religion forbids the use of

such technology" filed suit under RLUIPA. *Id.* The lower courts concluded that the ordinance

was the "least-restrictive means of meeting the government's compelling interest of protecting

public health and the environment." *Mast v. County of Fillmore*, No. A19-1375, 2020 WL

3042114, at *2 (Minn. Ct. App. June 8, 2020), *cert. granted, judgment vacated sub nom. Mast*,

141 S. Ct. 2430.

Justice Gorsuch's concurring opinion explained why *Fulton* necessitated vacatur:

> Perhaps most notably, the County and courts below erred by treating the County's *general* interest in sanitation regulations as "compelling" without reference to the *specific* application of those rules to this community. . . . Accordingly, the question in this case "is not whether the County has a compelling interest in enforcing its septic system requirement *generally*, but whether it has such an interest in denying an exception" from that requirement to the Swartzentruber Amish *specifically.*

*Mast,* 141 S. Ct. at 2432 (emphases in original; brackets omitted).

In this case, none of the City's stated interests survives strict scrutiny. First and foremost, the City repeatedly averred that it <u>could not</u> produce a representative competent to testify to "[t]he governmental interest(s) that the City contends the Ordinance serves and how the Ordinance serves those governmental interests" and stated that the only "known considerations were included in Defendant's interrogatory responses: *public welfare, maintaining peace and order, and reducing crime.*" Howard Dep. 35:24-37:3, Dep. Ex. 2. Sondag Decl., Exs. 20, 21 (June 27 and July 3, 2023, correspondence).[10] The City's inability to explain how the broadly formulated interests identified in its Interrogatory responses are served by the Ordinance as applied to Plaintiffs is tantamount to a concession that no interest satisfies this test.

A close analysis of the "public welfare" and "peace and order" prongs of the City's pat response is indicative of how the claimed interests break down when "properly narrowed." *See Fulton,* 141 S. Ct. at 1881. Just as Philadelphia's refusal to contract with the foster agency threatened to reduce rather than increase available foster families—a result at odds with the government's stated interest of "[m]aximizing the number of foster families" (*id.* at 1881-82)— the City's effort to reduce the number of free meals available *harms* rather than *promotes* the

---

[10] The Court may take judicial notice of its own records that the City repeated this response to Plaintiffs' FRCP 30(b)(6) topics multiple times, including after a court order required production of a witness.

"public welfare."  It is undisputed that the City provides no homeless services and that St. Timothy's provides more no-cost meals than any other charitable entity in Brookings.  St. Timothy's plays an important role in the community, and limiting its feeding ministry would cause serious harm.  *See, e.g.,* Kaplansky Decl. ¶¶ 3-6 (St. Timothy's Community Kitchen cared for a "young, single, and pregnant mother" and ensured her "child was born healthy in large part to having the mental and physical support" from the kitchen); Bowyer Decl. ¶¶ 4, 7, 8 (St. Timothy's' feeding ministry provided declarant nutritious food until he was hired in July 2023 and built his "self esteem"; the ministry helps people "get[] off the street" because "[w]hen you don't have to worry about where you're going to eat, you can think forward to the future, plan ahead, and work towards that"); Mora Decl. ¶¶ 3-5 (describing how St. Timothy's' feeding ministry fed her family and helped them "move from just surviving every day" to attaining "a stable home and employment"); Colbert Decl. ¶¶ 4, 7 (explaining that, without meals from St. Timothy's' soup kitchen he would have no other choice but to "eat literal garbage and hope to not get sick").  Indeed, the City's counsel expressly acknowledged "*the positive benefits* this meal service provides to the community" during a period that St. Timothy's was serving *six* meals per week.  Sondag Decl., Ex. 13 (emphasis added).  "A law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprotected."  *Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 547 (1993) (internal quotation marks and citation omitted).  That is precisely what the Ordinance does here.

> The City's general interest in "preventing crime" also fails to withstand strict scrutiny. When the City adopted the Ordinance, the only information related to "crime" in the record was the "calls for service through dispatch of the Brookings Police Department" at Brookings-area

churches, as reflected in the June 7, 2021, Workshop Report.  Howard Dep. Ex. 3 at 3.  That

information is unpersuasive.  First, "it would be quite remarkable to hold that [constitutionally

protected activity] by a law-abiding [citizen] can be suppressed in order to deter conduct by a

non-law-abiding third party."  *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).  Second, the

2010-2020 comparison is not statistically sound.  For example, it did not disambiguate non-

criminal calls for service (*e.g.,* calls for medical attention), and the City included no information

regarding how calls for service had changed overall in Brookings from 2010-2020.  Deposition

of Donny Dotson ("Dotson Dep.")[11] 67:15-21, 68:15-69:3, 69:14-16, 69:21-25.  But even if the

comparison were sound, it still does not support the City's position because the calls were not

filtered to the specific time of day that the churches operate their meal services—for St.

Timothy's, between 12:00 p.m. and 1:00 p.m. on weekdays and Saturday, and 3:00 p.m. to 4:00

p.m. on Sundays.  *Id.* 66:1-6; 66:20-67:3; 69:4-5; Lindley Decl. ¶¶ 7-8.  Accordingly, the City

cannot show that these calls substantiate a compelling interest that could be resolved by

"imposing the burden on religious exercise *in the particular case at hand*."  *See Grace Church*,

555 F. Supp. 2d at 1140 (emphasis added).

       Nor can the City rely on purported neighbor complaints regarding St. Timothy's to justify

any of its generalized interests because such complaints are insufficient as a matter of law.  *See*,

*e.g.*, *First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 756-57, 762 (D. Minn.

2018) (ordinance limiting operation of non-profit shelter in church's basement in response to

neighbor complaints substantially burdened religious exercise under RLUIPA).  Moreover, the

record is bereft of specific complaints made to the City before adoption of the Ordinance

---

[11] Excerpts and Exhibits from the Dotson Deposition are attached as **Exhibit 7** to the Sondag
Declaration.

regarding the *meals served* at St. Timothy's.  The closest is a letter appended to the June 7 Workshop Agenda in which a resident attributes concerns about the public Azalea Park to St. Timothy's.  Howard Dep. Ex. 3 at 10-11.  Such a complaint does not create a compelling interest in stopping or limiting St. Timothy's' feeding ministry as St. Timothy's is not responsible for the conduct of others at a city park.  *See generally Bartnicki,* 532 U.S. at 529-30.

      The City's asserted interest in changing the Land Development Code to "allow" Brookings churches to continue the feeding ministries they had engaged in for years is also quickly dismissed.  Even assuming that Plaintiffs' permitted operation of a "church" does not encompass its feeding ministry—and it does—adherence to zoning ordinances generally is not an "'interest[] of the highest order.'"  *Westchester Day Sch.*, 504 F.3d at 353 (citation omitted).  Additionally, alleged concerns "ring hollow" when the government has been "complacent" about a subject for many years only to "suddenly burst into action."  *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,* 218 F. Supp. 2d 1203, 1225, 1228 (C.D. Cal. 2002).  It is undisputed that the City allowed Brookings churches to serve no-cost meals for more than a decade before it suddenly decided to change the BMC to proscribe such conduct absent a permit imposing limiting conditions.  And it effectuated this change in the BMC only after the churches obtained "commercial kitchen" licenses *at the City's urging.*  Any interest in addressing a zoning "problem" created by the City itself is not compelling as a matter of law.

      Finally, the fact that the City had long permitted meal services at St. Timothy's is also fatal to their argument that the Ordinance promotes public welfare, peace and order, and deters crime.  "One way to evaluate a claim of compelling interest is to consider whether in the past the governmental actor has consistently and vigorously protected that interest." *Grace Church*, 555 F. Supp. 2d at 1140-41.  The record demonstrates that free lunchtime meals—including when

served at 401 Fir Street more than two days per week—were not seen as a threat worthy of vigorous protection until it suited the City's internal priorities.

> **b.**     **The City's Purported Interests Are Not Compelling Because They Are Post-Hoc Rationalizations.**

The City's identified interests are not "compelling" because they were not the *actual* interests behind the Ordinance.  The "strict scrutiny analysis requires not only that the government's stated purpose is a compelling interest, but that it is also a *genuinely-held* purpose." *Cottonwood*, 218 F. Supp. 2d at 1228 (emphasis added).  "To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose'" and "the legislature must have had a strong basis in evidence to support that justification[.]" *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996).  "[P]ost-hoc rationalizations provide an insufficient basis to find a compelling governmental interest"; rather, "the court must look to the compelling interest asserted by defendants at the time of the ban." *Native Am. Council of Tribes v. Weber*, 897 F. Supp. 2d 828, 849 (D.S.D. 2012), *aff'd*, 750 F.3d 742 (8th Cir. 2014); *Masonry Bldg. Owners of Or. v. Wheeler*, 394 F. Supp. 3d 1279, 1306 (D. Or. 2019) ("[S]hifting post-hoc rationalizations do little to advance the City's stated purposes for passing the Ordinance.").  Likewise, a government fails to assert a compelling interest where there was "virtually no evidence in the record" to support it.  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978); *see also Yellowbear v. Lampert,* 741 F.3d 48, 59 (10th Cir. 2014) ("post-hoc rationalizations unsupported by record evidence" do not create compelling interest).

The undisputed material facts demonstrate that code conformance, public welfare, maintaining peace and order, and crime were not "genuinely-held purpose[s]" behind the Ordinance. *See Cottonwood*, 218 F. Supp. 2d at 1228.  Certainly, public welfare was not in mind when the City used churches' *acquisition* of commercial kitchen permits—initially

recommended by the City for the alleged purpose of promoting food safety—to advise the churches that their feeding ministries *were no longer allowed*. Sondag Decl. Exs. 13, 15; Howard Dep. Exs. 7, 11. Deposition testimony underscores the transitory nature of this particular stated interest: the Ordinance's principal drafter opined that food prepared "at home" and brought to a potluck would not be subject to the Ordinance precisely because the food was prepared at a different location from where it was served—namely, at home, where *no* food safety regulations govern. Baron Dep. 82:7-83:9. By the same token, had crime been the City's target, reason dictates that an inquiry into the types of crime near St. Timothy's, and when they were occurring, would have preceded adoption of any legislation. No such inquiry occurred.

Rather, the record shows that the City manufactured a gap in the BMC by deciding to treat "benevolent meal services" as if they were not a church use in order to challenge St. Timothy's CUP. Baron Dep., Exs. 36, 37. City officials expressed views that St. Timothy's ministry to the community, "vagrants" included, a "blight" on Brookings, and believed the Ordinance could "reduce[] the amount of activity" there. Baron Dep. Ex. 43; Baron Dep. 27:22-28:8; Hedenskog Dep. 71:5-12, 73:7-12 (Ordinance limit[s] the impact" of "indigent individuals hanging around the meal service location"). Even when not associated with people, "blight" is a subjective "esthetic harm" that does not qualify as a compelling government interest under RLUIPA. *Cottonwood*, 218 F. Supp. 2d at 1228 (blight not compelling government interest). And it is certainly different than the post-hoc interests drafted by the City to justify the Ordinance after litigation commenced.

### 3.    The City Did Not Employ Least Restrictive Means.

Even if the City had managed to articulate a genuinely-held, compelling government interest, it also bears the burden of showing that the regulation is the least restrictive means of

advancing that interest.  42 U.S.C. § 2000cc.  "[S]o long as the government can achieve its

interests in a manner that does not burden religion, it must do so."  *Fulton*, 141 S. Ct. at 1881;

*Turner v. Collier*, No. 4:19-CV-04124, 2022 WL 4734828, at *9 (S.D. Tex. Sept. 30, 2022)

(quoting *Fulton* in RLUIPA challenge).  The City did not and cannot meet this requirement.

As discussed above, limiting St. Timothy's' ministry does not advance *any* of the City's

claimed interests.  It follows, then, that the City's actions do not constitute the least restrictive

means of achieving those interests.  *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 n.9

(D. Mass. 2015) (panhandling ordinance "not close to the least restrictive means" available to

achieve cited public safety interest where ordinance was not in fact intended to serve that

purpose). Moreover, a government "cannot meet its burden to prove least restrictive means

unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive

measures before adopting the challenged practice."  *Warsoldier v. Woodford*, 418 F.3d 989, 999

(9th Cir. 2005); *Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 807

(1996) (Kennedy, J., concurring in part) ("When applying strict scrutiny, we will not assume

plausible alternatives will fail to protect compelling interests; there must be some basis in the

record, in legislative findings or otherwise, establishing the law enacted as the least restrictive

means."). The City cannot meet its burden here, either.

There is no evidence that the City "actually considered and rejected" less restrictive

measures to the Ordinance.  When asked whether the City "consider[ed] avenues to address [its]

concerns . . . other than limiting benevolent meal services," Mayor Hedenskog responded that

"[t]he ordinance itself speaks to that."  Hedenskog Dep. 76:3-77:8.  Indeed, in response to an

Interrogatory seeking "all means, other than the Ordinance, that the City considered to advance"

its stated interests, the City listed alternative burdens that it suggested *churches* consider for their

services—"relocating"; "modifying operations to not utilize a permanent kitchen facility"; "establish[ing] potential limits on the frequency and volume of potential meal services"—not alternatives to limiting meal services that *the City* considered. Sondag Decl., Ex. 19 (Interrogatory 8 Response).[12] The Petition's goal of stopping camping and nighttime congregation at St. Timothy's *was*, in fact, achieved by the expiration of Rule 2020-1. To the extent the City had an interest in addressing homelessness in Brookings more broadly, it affirmatively *declined* the most tailored method for doing so—revising its code to permit a homeless shelter and/or considering a Project Turnkey grant.

Plaintiffs have made the requisite *prima facie* case under RLUIPA and there is no genuine dispute of material fact that the City cannot meet its burden to show that the Ordinance is the least restrictive means of advancing any compelling government interest. The Court should enter summary judgment in Plaintiffs' favor on Claim One, declare the Ordinance unlawful, permanently enjoin the Ordinance's enforcement, and award Plaintiffs their reasonable attorney fees and costs. The Court should also enter summary judgment against the City's First, Second, Fourth, and Fifth Affirmative Defenses.

**B.    Plaintiffs' Motion Should Be Granted Because the Ordinance Violates the Free Exercise Clause (Second Claim).**

Because Plaintiffs prevail under RLUIPA, the Court need not reach Plaintiffs' constitutional claims. *See, e.g., Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193,

---

[12] Interrogatory No. 8 further states that the City "held public hearings, workshops, and comment periods and circulated documents that discussed numerous options for addressing public welfare, peace and order, and crime prevention concerns while allowing the legal provision of benevolent meal services in residential zones of the City." *Id.* No such evidence appears in the record. Regardless, the City may not attempt to introduce such evidence because it falls within the scope of FRCP 30(b)(6) Topic No. 5 (*see* Howard Dep. Ex 2 at 4) to which the City refused to respond. *See* ECF No. 40 (Sept. 30, 2023, order).

205 (2009) (courts do not decide constitutional questions if statutory basis for resolution exists); *Standard Oil Co. of Cal. v. Arizona*, 738 F.2d 1021, 1023 (9th Cir. 1984) (same).  Should the Court address these claims, however, Plaintiffs also prevail as a matter of law.

The First Amendment to the United States Constitution prohibits government action that limits the free exercise of religion absent a compelling government interest (the "Free Exercise Clause").  *Lukumi Babalu Aye*, 508 U.S. at 531.  "'[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'"  *Id.* (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)).  To determine if a law violates the Free Exercise Clause, courts begin by assessing (1) whether it is "neutral and of general applicability" and (2) if so, whether it is narrowly tailored to advance a compelling government interest.  *Id.*

1.    **The Ordinance Is Not Neutral.**

A law implicates the Free Exercise Clause if its "object or purpose . . . is the suppression of religion or religious conduct."  *Id.* at 533.  "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt"; even if the text of a law is facially neutral, "[o]fficial action that targets religious conduct for distinctive treatment" reveals improper object or purpose.  *Id.* at 534.  Record of the drafting process may reveal intent to target religious conduct; choosing words that have a "religious origin" may also support such a conclusion.  *Id.* at 533-34.  Similarly, "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history" also bear on the question of neutrality.  *Id.* at 540.  Where an ordinance is enacted "'because of,' not merely 'in spite of,'" a religious practice, it is not neutral.  *Id.*

The Supreme Court applied these considerations to strike ordinances prohibiting ritual animal sacrifice on a First Amendment challenge brought by adherents to the Santeria religion—a religion in which animal sacrifice is a core belief.  *Id.* at 526, 536.  In analyzing the neutrality of the challenged ordinances, the Court held that they effected a "religious gerrymander" by defining "sacrifice" to "exclude[] almost all killings of animals except for religious sacrifice," noting that the ordinances exempted from compliance "any licensed food establishment[.]"  *Id.* at 536 (brackets, quotation marks, and citation omitted).  In this way, "the burden of the ordinance, in practical terms, [fell] on Santeria adherents but almost no others."  *Id.*

The Court also cited "significant hostility" expressed toward the religious practice during city council meetings, including one official's comment that "the 'Bible says we are allowed to sacrifice an animal for consumption . . . but for any other purposes, I don't believe that the Bible allows that'" and a statement that "'[t]his community will not tolerate religious practices which are abhorrent to its citizens.'"  *Id.* at 541-42 (citations omitted).  The defendant city's decision to employ the terms "sacrifice" and "ritual"—words heavily associated with religion—also "supported" the conclusion that the City had improperly targeted the Santeria faith.

Here, the undisputed evidence is similarly clear that the City improperly "target[ed] religious conduct for distinctive treatment."  *Id.* at 534.  The record is replete with express references to the Ordinance targeting *churches.  See* Howard Dep. Ex. 12 (discussing "method for allowing benevolent meal services in churches"); Howard Dep. Ex. 3 at 3 (describing "soup kitchen at St. Timothy's"); Howard Dep., Exs. 6 at 14, 7 (letter sent only to Brookings churches); Howard Dep. Ex. 8 at 2 (noting that "[t]he BMC doesn't allow restaurants . . . as they are currently operating in the *churches'* community kitchens") (emphasis added).  The Ordinance effects a "religious gerrymander" by exempting entities that offer meals for a charge rather than

"benevolently"—itself a religiously-charged word.  *See Lukumi Babalu Aye*, 508 U.S. at 536.

Such exempted entities within residential zones include "bed and breakfast[s]" and "[p]ublic and

quasi-public halls, lodges and clubs."  BMC 17.20.040.N, J.

      Nor is there any genuine dispute that the Ordinance was enacted "because of" the

Christian belief that the homeless in Brookings deserve care and ministry.  *See, e.g.,* Howard

Dep. Ex. 3 at 3 (discussing St. Timothy's' service of people "on fixed incomes, experiencing

homelessness, families or the working poor").  And, as in *Lukumi Babalu Aye,* the record reveals

"significant hostility" towards this religious practice.  During the June 7, 2021, meeting,

Mayor Hedenskog opined on what "a traditional church would operate like," explaining that "I

don't believe that that would contrive of being a meal service six to seven days a week.  I don't

think anybody would agree that's a traditional role for a church."  Sondag Decl., Ex. 22 (June 7,

2021, minutes 91:5-11).  Later, Councilor Schreiber emailed that he was "skeptical when I hear

people say churches should focus on feeding the hungry because that's what Jesus did.  Jesus fed

people <u>*maybe two meals*</u> in his earthly ministry. . . . Scripture certainly does not prevent us from

assisting non-believers.  However, teaching that says Christians are obligated to take care of non-

believers is clearly, in my opinion, outside the bounds of Biblical instruction."  Hedenskog Dep.

Ex. 26 at 2 (emphasis in original); Schreiber Dep. 135:3-12, 136:2-139:17 (describing exchange

as a "theological discussion" contrasting Mr. Schreiber's "understanding of biblical teachings"

and Father Bernie's "fundamental view of his religion to feed people"). The Ordinance

improperly targets religious conduct for distinctive treatment and is therefore not neutral.

*Lukumi Babalu Aye,* 508 U.S. at 534.

/ / /

2.      **The Ordinance Is Not of General Applicability.**

The Ordinance is also subject to strict scrutiny because it is not generally applicable.  *See Fulton,* 141 S. Ct. at 1877.  The general applicability requirement exists so that the "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief."  *Lukumi Babalu Aye,* 508 U.S. at 543.  Where an ordinance is underinclusive to serve the government's stated ends, it is not of general applicability.  *Id.*  Thus, in *Lukumi Babalu Aye,* the government's failure to prohibit other conduct that similarly endangered the stated interests of promoting public health and preventing animal cruelty, including fishing, pest extermination, and hunting (and eating hunted game without inspection), compelled the Court to conclude that the ordinances were not generally applicable.  *Id.* at 544.

So too here.  Only Brookings churches are burdened by the Ordinance's prohibition on offering meals free of charge in residential zones.  *See* Sondag Decl. Ex. 19 (Interrogatory 4 Response).  The Ordinance did not change to the operations of conditionally permitted institutions that charge for meals in residential zones such as bed and breakfasts, lodges, and clubs.  *See* BMC 17.20.040.N, J.  Indeed, the City has concluded that the Ordinance should not affect operations of the Chetco Activity Center—a secular, residentially zoned community center that advertises "serv[ing] hundreds of meals to shut-ins . . . in our dining room each month" for a "suggested donation of $6.00 per month."  Sondag Decl., Exs. 19 (Interrogatory 4 Response) and 23; Howard Dep. 96:2-5.

The undisputed evidence establishes that the City has "in a selective manner impose[d] burdens only on conduct motivated by religious belief."  *Lukumi Babalu Aye,* 508 U.S. at 543.  Because the Ordinance is not generally applicable or neutral, the City cannot establish its Seventh and Eight Affirmative Defenses.

      **3.**      **The Ordinance Is Not Narrowly Tailored to Serve Compelling Government Interests.**

A law that burdens religious practice as described must advance "'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Id.* at 546.  As with RLUIPA, a government policy survives strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. *Id.*  For the reasons set forth in Sections VI.A.2 and 3, *supra,* the City cannot make that showing here.

Because the Ordinance is not neutral, not generally applicable, and not narrowly tailored to serve any compelling government interest, the Court should enter summary judgment in Plaintiffs' favor on Claim Two and against the City.  The Court should further declare the Ordinance unlawful, permanently enjoin the Ordinance's enforcement, and award Plaintiffs their reasonable attorney fees and costs.

**C.**      **Plaintiffs' Motion Should Be Granted Because the Ordinance Is Vague and Violates Due Process (Fourth Claim).**

The Ordinance is also unconstitutional on its face and as applied to Plaintiffs for the independent reason that the phrase "periodic food service operation that provides food to the public without charge" is vague.  It gives no clear instruction to those whose actions may be regulated or to those who may do the regulating.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (examining city ordinance).  An enactment is unconstitutionally vague if it is not "sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (quoting *Grayned*, 408 U.S. at 108), *as amended* (July 29, 1998). A facial challenge is permissible when the statute in question clearly implicates First Amendment rights. *Id.* (citing *United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir. 1996)).

Enactments that are insufficiently clear are void for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Id.*; *see also Grayned*, 408 U.S. at 108-09 (when enactments fail to "provide explicit standards for those who apply them," they "impermissibly delegate[ ] basic policy matters . . . for resolution on an ad hoc and subjective basis"); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 170 (1972) (enactment is void if it provides "no standards governing the exercise of … discretion," such that it can be used as a "convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure'" (citation omitted)).

"[W]hen First Amendment freedoms are at stake, an even greater degree of specificity and clarity is required." *See, e.g., N.A.A.C.P. v. Button*, 371 U.S. 415, 432-33 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."); *see also Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) ("[V]agueness concerns are more acute when a law implicates First Amendment rights and, therefore, vagueness scrutiny is more stringent.").

Here, the terms "periodic food service operation," "provides food," and "to the public" are vague because they do not give sufficient information regarding the regulated conduct. "Periodic" means "occurring at regular intervals" or "occurring repeatedly from time to time." *Webster's Third New International Dictionary*, 1680 (2022). Any interval between occasions where persons provide food is encompassed within that definition. "Food service operation,"

"[p]rovides food" and "to the public" are all undefined and could be ascribed different meanings. The Ordinance could apply to the act of distributing Halloween candy once a year or a monthly neighborhood barbeque.  Indeed, the testimony of those involved with drafting the Ordinance—and those empowered to enforce it— reflects very different ideas about the regulated conduct that falls within its scope.

According to the Public Works Director, while the Ordinance applies to St. Timothy's feeding ministry, it would not apply to recurring neighborhood potlucks or any gathering where food is prepared off-site.  Baron Dep. 82:7-83:9, 85:5-14.  The City Manager asserted that she does not believe a doughnut or cookie service at the church after Sunday Mass is subject to the Ordinance because the service is intended for parishioners—not the "public"—even if a church's doors are open to all members of the public to attend.  Howard Dep. 90:10-24.  And the Mayor has testified that recurring meal services associated with what he believes are "standard faith service" and/or Christmas, Easter, or Thanksgiving would not be regulated because "we do not regulate meal services that are associated with the normal church services."  Hedenskog Dep. 60:3-62:2.  None of these distinctions are clear in the plain text of the Ordinance.

In addition to failing to notify individuals of prohibited conduct, the Ordinance also provides no clear or firm "standards governing the exercise of . . . discretion," such that it may be used as a "convenient tool for harsh, and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure."  *See Papachristou*, 405 U.S. at 162, 170 (internal quotation marks and citation omitted); *Bloom v. City of San Diego*, No. 17-cv-23-24-AJB-NLS, 2018 WL 9539239, at *5 (S.D. Cal. Aug. 21, 2018) (enjoining ordinance because police officers could "choos[e] not to ticket" a retiree "who owns a surf van equipped with an outdoor shower, space for resting, equipment for beach dwelling such as chairs

and a folding table, and coolers to store food and beverages […] while at the same time, ticketing a similar vehicle owned by [p]laintiffs or other homeless individuals").

Arbitrary enforcement is not merely a threat—although such a threat, standing alone, is sufficient to pass constitutional muster.  Rather, the City *already* selectively applied the Ordinance to St. Timothy's when it served the church a Notice of Abatement while allowing the secular Chetco Activity Center to offer meals on a "donation" basis.  Howard Dep. 96:1-5.

Because the Ordinance's text is vague and does not provide adequate notice to those to whom it may apply, allows for arbitrary enforcement, and impermissibly chills constitutionally protected conduct, summary judgment should enter in Plaintiffs' favor, and against the City, on the Fourth Claim. The Court should declare the Ordinance unlawful, permanently enjoin the Ordinance's enforcement, and award Plaintiffs their reasonable attorney fees and costs.

**D.    Plaintiffs' Motion Should Be Granted Because the Ordinance Violates Plaintiffs' Rights of Free Speech and Association (Third Claim).**

Summary judgment should also enter in favor of Plaintiffs' Third Claim because the Ordinance restricts association, assembly, and speech in violation of the First Amendment. "Association for the purpose of engaging in protected activity is itself protected by the First Amendment." *Santopietro v. Howell*, 73 F.4th 1016, 1025 (9th Cir. 2023).  "Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* (internal quotation marks, citation, and brackets omitted).  Where a regulation on expressive conduct is content-based, it is subject to strict scrutiny to "ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.'" *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980) (citation omitted). Regulations adopted because of "disagreement with the message [] convey[ed]" presumptively

violate the First Amendment. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47 (1986).  Content-neutral regulations that do not ban speech altogether, but designate where speech may occur, are analyzed as time, place, and manner regulations. *Renton,* 475 U.S. at 46.  Time, place, and manner regulations pass constitutional muster if they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication. *Ward,* 491 U.S. at 791.  The government bears the burden of "provid[ing] some factual support for its claim that exclusion of churches advances its goal[s.]"  *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 469 (8th Cir. 1991).

The Ordinance fails on its face and as applied under either standard.  As discussed in Section VI.B.1, *supra,* the Ordinance is a content-based restriction that burdens only Brookings churches.  It limits meal services where Father Bernie and St. Timothy's' congregants (and congregants of other Brookings churches) provide comfort, discuss scripture, and pray.  *See* Lindley Decl. ¶ 4.[13]  The City's stated purposes for the Ordinance are demonstrably pretextual, and there is no genuine dispute that the City's disagreement with St. Timothy's' religious ministry motivated the legislation.

Even if the City's proffered interests were significant, the Ordinance is not narrowly tailored to advance them.  *See* Section VI.A.3, *supra.*  As discussed, the government cannot meet its burden of providing factual support that the Ordinance advances the interest of promoting public welfare, maintaining peace and order, and preventing crime.  The Ordinance also fails to

---

[13] Because this impermissible application of the Ordinance—restricting Father Bernie, St. Timothy's, and other Brookings-area churches from meeting to worship, gather, discuss scripture, and pray—is substantial when judged in relation to the statute's plainly legitimate sweep; the Ordinance is also unconstitutionally overbroad.  *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).

leave St. Timothy's with ample alternative channels: St. Timothy's is a non-profit church; requiring it to pay to purchase or rent a commercial restaurant space when it has a fully licensed "commercial kitchen" capable of supporting its feeding ministry is patently unreasonable.  *See* Lindley Decl. ¶ 14. And even if it could relocate, the City itself has been unable to identify such a restaurant space in a commercial zone. *See* Sondag Decl. Ex. 18 (August 30, 2021, Meeting Minutes at 59:17-60:1); Hedenskog Dep. 79:16-82:1.  For these reasons, the City also cannot establish the Sixth, Seventh, and Eighth Affirmative Defenses.

The City cannot meet the heavy burden required to restrict St. Timothy's' free speech, expression, and association rights, and summary judgment should enter in Plaintiffs' favor, and against the City, on Plaintiffs' Third Claim.  The Court should declare that the Ordinance unlawful, permanently enjoin the Ordinance's enforcement, and award Plaintiffs their reasonable attorney fees and costs.

**E.      Plaintiffs' Motion Should Be Granted Because the Ordinance Violates Plaintiffs' Rights to Free Religious Exercise and Expression Under the Oregon Constitution, Article I, Sections 2, 3, and 8 (Fifth and Sixth Claims).**

The Court need not reach Plaintiffs' state constitutional claims because they are entitled to summary judgment on their statutory and federal constitutional claims.  Should the Court address these claims, however, Plaintiffs are also entitled to judgment in their favor.  The Oregon Constitution offers protections for Plaintiffs' expressive practices that are as robust or more robust than the federal constitution.  *See*, *e.g.*, *State v. Caraher*, 293 Or 741, 750 (1982); *see also* *State v. Henry*, 302 Or. 510, 515 (1987) (noting that Article 1, section 8, prohibits restraint of "the free expression of opinion" in manner more protective than its federal corollary).

1.      **Article I, Sections 2 and 3.**

Article 1, section 2, of the Oregon Constitution protects the right of all citizens to "be secure in the natural right, to worship . . . according to the *dictates of their own consciences*." (Emphasis added.)  Article 1, section 3, meanwhile, prevents the government from making any law that "*in any case whatever* control[s] the free exercise, and enjoyment of religeous [sic] opinions, or interfere[s] with the rights of conscience."  (Emphasis added.)  Under these sections, the "'state may [only] justify a limitation on religion by showing that it is essential to accomplish an overriding governmental interest.'"  *Emp. Div. v. Rogue Valley Youth for Christ*, 307 Or. 490, 498 (1989) (citation omitted).  A law that burdens the free exercise of religion is not essential unless it represents the least restrictive means available to advance the overriding governmental interest.  *State ex rel. Juvenile Dep't of Polk Cnty. v. Tucker*, 83 Or App 330, 334 (1987).

Plaintiffs succeed on the merits of their Fifth Claim for the same reasons they succeed on the merits of their federal claims.  The Ordinance impermissibly limits Plaintiffs' right to freely exercise their religious opinions and worship according to the dictates of their conscience by severely restricting their ability to minister to those in need.  Just as the City can demonstrate no compelling government interest, it cannot identify any "overriding" interest, or show that the Ordinance was the least restrictive means to advance it.

2.      **Article I, Section 8.**

Under Article I, section 8, "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for abuse of this right."  Article I, section 8 "prohibit[s] broadly any laws directed at restraining verbal or nonverbal *expression of ideas of any kind*"—including "physical acts, such as nude dancing or other explicit sexual conduct, that have an expressive

component." *State v. Ciancanelli*, 339 Or. 282, 311 (2005) (emphasis added); *see also City of Hillsboro v. Purcell,* 306 Or. 547, 555 (1988) (act of selling is subject to Article I, section 8 because it is "a form of communicative behavior").

Article I, section 8 protects St. Timothy's' feeding ministry because it has a strong expressive component.  For St. Timothy's' congregants, the feeding ministry is an act of worship.  Lindley ¶ 4; Zellmer ¶ 7 ("If you are a Christian, feeding people and caring for them is what you are supposed to do.").  It is a space where people gather to communicate about faith and build community. *See, e.g.,* Lindley Decl. ¶ 4 (meal service allows Plaintiff to speak with people who are lonely, direct individuals to resources, discuss scripture, and pray with those who want him to do so); Bowyer Decl. ¶ 4 ("When you think there is no one to reach out to, you get despairing.  St. Timothy's gives a place to meet, warm up, eat, and to help one another").

Under Oregon law, the Ordinance is unconstitutional on its face because it is "directed by its terms at restraining or restricting speech or expression"—meals offered benevolently—rather than a harm it intends to punish. *Ciancanelli*, 339 Or. at 319-20; *City of Portland v. Tidyman*, 306 Or. 174, 185 (1988) (law that fails to state a harm or effect of speech should be analyzed under first category, even if legislative history discusses supposed harm of the speech).  Only if there were some "'historical exception that was well established when the first American guarantees of freedom of expression were adopted . . .'" would the Ordinance escape invalidation under this first *Robertson* category.  *Ciancanelli*, 339 Or. at 321 (quoting *State v. Robertson*, 293 Or. 402, 412 (1982)).  No such exception exists.

Even if the Ordinance were directed at a harm, the Ordinance still violates Article I, section 8.  Under these circumstances, the City must "show[] the reality of the threatening effect *at the place and time*"; it is improper to "presume" that protected expression will cause harm and

attempt to proscribe it with a "generalized rule against the substance of the expression." *Tidyman*, 306 Or. at 188 (emphasis added). As discussed above, the City has not and cannot demonstrate the reality of harm at the place and time that Plaintiffs' feeding ministry occurs. Finally, the Ordinance is not a permissible time, place, and manner restriction. As under federal law, such restrictions must be content-neutral and avoid "effectively prohibit[ing] certain forms of speech while allowing nonexpressive conduct," advance a legitimate state interest without restricting more expression than necessary, and leave "ample avenues to communicate the individual's message despite the law's restrictions." *State v. Babson*, 355 Or. 383, 406-07 (2014) (internal quotation marks and citations omitted). As discussed above, the Ordinance is content-based (*see supra* Section VI.B.1), prohibits religious expression while allowing secular institutions like the Chetco Activity Center to serve donation-based meals, advances no legitimate state interests, and leaves only one avenue for St. Timothy's to continue to communicate its religious message through meal service: bearing the untenable and unwarranted expense of relocating to a commercial zone. Such an unreasonable burden is particularly suspect when applied to a church that has offered meals without charge to its community at its current location for more than a decade. Summary judgment should enter in Plaintiffs' favor, and against the City, on Plaintiffs' Fifth and Sixth Claims. The Court should declare that the Ordinance unlawful, permanently enjoin the Ordinance's enforcement, and award Plaintiffs their reasonable attorney fees and costs.

/ / /

/ / /

/ / /

## VII.  CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motion for summary judgment.

DATED:  October 6, 2023

STOEL RIVES LLP

s/ Samantha K. Sondag
Amy Edwards, OSB No. 012492
amy.edwards@stoel.com
Samantha K. Sondag, OSB No. 154244
Email: samantha.sondag@stoel.com
Rachelle D. Collins, OSB No. 214059
rachelle.collins@stoel.com
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone:  503.224.3380

Attorneys for Plaintiffs

120764426.  0076396-00001