Casey M. Nokes, OSB No. 076641
cnokes@cablehuston.com
CABLE HUSTON LLP
1455 SW Broadway, Suite 1500
Portland, Oregon 97201-3412
Tele: (503) 224-3092

Meredith Kessler, *pro hac vice application pending*
mhollan4@nd.edu
NOTRE DAME RELIGIOUS LIBERTY CLINIC
Eck Hall of Law
Notre Dame, Indiana 46556
Tele: (574) 631-6981

*Attorneys for Amicus Curiae*
*Notre Dame Religious Liberty Clinic*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **ST. TIMOTHY'S EPISCOPAL CHURCH**, by and through **THE DIOCESE OF OREGON, dba THE EPISCOPAL DIOCESE OF OREGON**, an Oregon nonprofit corporation; and **REVEREND JAMES BERNARD LINDLEY**, vicar of St. Timothy's Episcopal Church, | Civil No. 1:22-cv-00156-CL |
| Plaintiffs, | **BRIEF OF *AMICUS CURIAE* NOTRE DAME LAW SCHOOL RELIGIOUS LIBERTY CLINIC IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **CITY OF BROOKINGS**, an Oregon Municipal government, | |
| Defendant. | |

TITLE PAGE

# TABLE OF CONTENTS

Page

I.    INTEREST OF AMICUS CURIAE ................................................................. 1

II.    ARGUMENT ............................................................................................. 1

    A.    Congress enacted RLUIPA to provide expansive protection for religious
exercise against discrimination by government officials regulating land
use—including the same kind of discrimination that St. Timothy's faces
in this case. ............................................................................................ 2

        (1)    After the Supreme Court narrowed the scope of the Free Exercise
Clause, Congress enacted RLUIPA to provide expansive protection
for religious liberty. ..................................................................... 2

        (2)    Congress heard repeated testimony of widespread discrimination in
land-use regulation against the religious exercise of churches and
organizations who minister to those in need. ............................... 6

    B.    Federal courts have repeatedly found a substantial burden on religious
exercise in violation of RLUIPA in cases just like this one. ............................... 11

III.    CONCLUSION ............................................................................................ 14

# TABLE OF AUTHORITIES

Page

**Cases**

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)........................................................................................................ 2

*Church of Foursquare Gospel v. County of San Leandro*,
673 F.3d 1059 (9th Cir. 2011) ...................................................................................... 12

*City of Boerne v. Flores*,
521 U.S. 507 (1997)........................................................................................................ 3

*City Walk – Urban Mission Inc. v. Wakulla County Florida*,
471 F. Supp. 3d 1268 (N.D. Fla. 2020)....................................................................... 11

*Emp't Div., Dep't of Human Res. v. Smith*,
494 U.S. 872 (1990).................................................................................................... 1, 3

*First Lutheran Church v. City of St. Paul*,
326 F. Supp. 3d 745 (D. Minn. 2018)......................................................................... 11

*Greene v. Solano Cnty. Jail*,
513 F.3d 982 (9th Cir. 2008) ....................................................................................... 13

*Guru Nanak Sikh v. County of Sutter*,
456 F.3d 978 (9th Cir. 2006) .................................................................................. 12, 13

*Holt v. Hobbs*,
574 U.S. 352 (2015)................................................................................................ 2, 3, 6

*Micahs Way v. City of Santa Ana.*,
Case No. 8:23-cv-283-DOC-KES (C.D. Cal. June 8, 2023)...................................... 13

*Murphy v. Zoning Comm'n of Town of New Milford*,
148 F. Supp. 2d 173 (D. Conn. 2001)......................................................................... 12

*W. Presbyterian Church v. Bd. of Zoning Adjustment*,
862 F. Supp. 538 (D.D.C. 1994).................................................................................... 8

**Other Authorities**

*Church Allowed to Open Soup Kitchen in Foggy Bottom; Feeding the Homeless
is 'God's Work,' Not Government's Business, Federal Judge Says*, Wash. Post,
Apr. 15, 1994, at C03..................................................................................................... 8

Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C. Davis L. Rev.
755, 779 (1999)............................................................................................................... 4

H.R. Rep. No. 106-219, at 18 (1999).................................................................................... 4

H.R. Rep. No. 106-219, at 18–24 (1999) ............................................................... 3

Laycock, 32 U.C. Davis L. Rev. at 770–71 ......................................................... 5

Patricia E. Salkin & Amy Lavine, *The Genesis of RLUIPA and Federalism: Evaluating the Creation of a Federal Statutory Right and its Impact on Local Government*, 40 Urb. Law. 195, 256 (2008) .............................................................................................................. 4

Religious Land Use and Institutionalized Persons Act of 2000 .................................. 1

U.S. Dep't of Justice Civil Rights Div., *Report on the Twentieth Anniversary of the Religious Land Use and Institutionalized Persons Act* 3–4 (2020) ........................... 4

**Congressional Record and Statutory Provisions**

145 Cong. Rec. 16,216, 16,218–19 (1999) .......................................................... 10

146 Cong. Rec. 14,283, 14,283–86 (2000) .......................................................... 10

146 Cong. Rec. 14,283, 14,285 (2000) ............................................................. 7, 9

146 Cong. Rec. 16,698, 16,698 (2000) ............................................................... 4

146 Cong. Rec. 16,698, 16,698–99 (2000) ........................................................... 4

146 Cong. Rec. 16,698, 16,699 (2000) ............................................................... 5

146 Cong. Rec. 16,698, 16,700–01 (2000) ........................................................... 5

146 Cong. Rec. 16,698, 16,701 (2000) .............................................................. 10

146 Cong. Rec. E1564 (daily ed. Sept. 22, 2000) ................................................ 10

146 Cong. Rec. E1566 (daily ed. Sept. 22, 2000) ................................................. 9

42 U.S.C. § 2000bb-1 ..................................................................................... 3

42 U.S.C. § 2000cc(a)(1) ................................................................................ 3

42 U.S.C. § 2000cc-3(c) ................................................................................. 6

42 U.S.C. § 2000cc-3(g) ................................................................................. 6

42 U.S.C. § 2000cc-5(7)(A) ........................................................................... 13

*Congress' Constitutional Role in Protecting Religious Liberty: Hearing Before the S. Comm. on the Judiciary,* 105th Cong. 43 (1997) .......................................... 4, 5

*Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 17 (1998) ............................................................................................................. 8

*Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 17–18 (1998) ................................................................................................. 8

*Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 18 (1998) .............................................................................................................. 8

*Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 2 (1998) ................................................................................................................ 9

*Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 6 (1998) ................................................................................................................ 7

*Protecting Religious Liberty After Boerne v. Flores (Part III): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 59 (1998) .............................................................................................................. 9

*Religious Liberty Protection Act of 1998: Hearing on S. 2148 Before the S. Comm. on the Judiciary,* 105th Cong. 7 (1998) ................................................................. 5

*Religious Liberty Protection Act of 1998: Hearings on H.R. 4019 Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 202 (1998) .......................................................................................................... 10

## I.  <u>INTEREST OF AMICUS CURIAE</u>

The Notre Dame Law School Religious Liberty Clinic promotes and defends religious freedom for all people.  It advocates for the right of all people to exercise, express, and live according to their religious beliefs.  And it defends individuals and organizations of all faith traditions against interference with these fundamental liberties.  It has represented groups from an array of faith traditions to defend the right to religious exercise, to preserve sacred lands from destruction, to promote the freedom to select religious ministers and shape religious doctrine, and to prevent discrimination against religious schools and families.  The Clinic has participated in proceedings at all levels of federal and state courts, in administrative agencies, and before foreign courts and other governmental bodies around the world.

In addition to defending religious exercise wherever it is curtailed, the Religious Liberty Clinic advocates for religious organizations' freedom to serve those in need free from discrimination by local governments in the implementation of zoning and property laws.  It therefore seeks to ensure that this freedom is meaningfully defended in cases like this under the substantial protections offered by the Religious Land Use and Institutionalized Persons Act of 2000.

## II.  <u>ARGUMENT</u>

Congress unanimously enacted the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to provide sweeping protection for religious exercise against discrimination in land-use regulation.  To accomplish this goal, the statute generally prohibits the government from implementing land-use regulations in a manner that imposes a substantial burden on the religious exercise of a person or organization.  And several provisions—including the statute's capacious definition of "religious exercise" and its broad-construction mandate—emphasize the statute's breadth.

The creation of this protection was not spontaneous.  Following the Supreme Court's decision in *Employment Division v. Smith*, which limited the reach of the First Amendment's

Free Exercise Clause, statutory protection for religious exercise became all the more necessary. And, in enacting RLUIPA, Congress responded to repeated testimony of widespread discrimination against religious persons and organizations by local officials in their implementation of land-use regulations.

In fact, the Congressional Record demonstrates that Congress enacted RLUIPA in response to instances of discrimination against religious exercise that are nearly identical to the discrimination that St. Timothy's Episcopal Church faces in this case. Consistent with its Christian faith, the church has long served those in need by feeding the hungry in Brookings, Oregon, with the approval and even encouragement of the local government. But now, the government claims, the city's land-use regulations do not permit St. Timothy's to exercise its religion by feeding the hungry more than twice per week. As the Congressional Record demonstrates and courts around the country have repeatedly held, RLUIPA plainly prohibits such discrimination.

    **A.**    **Congress enacted RLUIPA to provide expansive protection for religious exercise against discrimination by government officials regulating land use— including the same kind of discrimination that St. Timothy's faces in this case.**

RLUIPA prohibits precisely the kind of discrimination that St. Timothy's challenges in this case. The Congressional Record reveals that Congress was well aware of, and indeed sought to prevent, discriminatory application of land-use regulations to burden religious exercise, including the provision of meal services and other ministries to those in need.

    **(1)**    **After the Supreme Court narrowed the scope of the Free Exercise Clause, Congress enacted RLUIPA to provide expansive protection for religious liberty.**

"Congress enacted RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 (RFRA) . . . 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). Under RLUIPA, "[n]o government shall impose or implement a land use regulation

in a manner that imposes a substantial burden on the religious exercise of a person, including a
religious assembly or institution, unless the government demonstrates that imposition of the
burden" "is the least restrictive means of furthering [a] compelling governmental interest." 42
U.S.C. § 2000cc(a)(1).

Prior to 1990, the Supreme Court "employed a balancing test" in free exercise cases,
"consider[ing] whether a challenged government action that substantially burdened the exercise
of religion was necessary to further a compelling state interest." *Holt*, 574 U.S. at 357. But, in
*Employment Division v. Smith*, the Court held that the Free Exercise Clause generally does not
excuse a person of her obligation to comply with a neutral, generally applicable law that
incidentally burdens her religious exercise. *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S.
872 (1990). Congress responded to *Smith* by "enact[ing] RFRA in order to provide greater
protection for religious exercise than is available under the First Amendment." *Holt*, 574 U.S. at
357. Like RLUIPA, RFRA prohibits the government from "substantially burden[ing] a person's
exercise of religion[,] even if the burden results from a rule of general applicability," unless "it
demonstrates that" doing so "is the least restrictive means of furthering [a] compelling
governmental interest." 42 U.S.C. § 2000bb-1. The Supreme Court, however, held RFRA
unconstitutional as applied to actions of the state and local governments because the statute
exceeded Congress's enforcement power under Section 5 of the Fourteenth Amendment. *See
City of Boerne v. Flores*, 521 U.S. 507 (1997). This meant that, while RFRA continued to ensure
that the federal government could not substantially burden religious exercise, individuals'
religious rights were not as protected from interference by state and local governments.

To provide this protection, Congress responded again. It enacted RLUIPA in response to
specific evidence of widespread discrimination against religious individuals and organizations by
state and local government officials overseeing land-use decisions. *See, e.g.*, H.R. Rep. No. 106-
219, at 18–24 (1999) ("Hearings before the Subcommittee on the Constitution in the 105th and
106th Congresses provide a substantial record of evidence indicating a widespread pattern of

religious discrimination in land use regulation.").  As co-sponsors Senators Orrin Hatch and Ted Kennedy observed, RLUIPA "is a targeted bill that addresses the two frequently occurring burdens on religious liberty" and "is based on three years of hearings . . . that addressed in great detail . . . the need for legislation."  146 Cong. Rec. 16,698, 16,698 (2000) (joint statement of Sens. Hatch and Kennedy); *see also* U.S. Dep't of Justice Civil Rights Div., *Report on the Twentieth Anniversary of the Religious Land Use and Institutionalized Persons Act* 3–4 (2020), https://www.justice.gov/crt/case-document/file/1319186/download.  Indeed, as Professor Doug Laycock testified to the Senate Committee on the Judiciary, "if there is any area of regulation where you can make a clear record of widespread discrimination, it would be zoning and land use regulation."  *Congress' Constitutional Role in Protecting Religious Liberty: Hearing Before the S. Comm. on the Judiciary,* 105th Cong. 43 (1997) (statement of Douglas Laycock, Professor, University of Texas).  This "substantial record" of "cumulative and mutually reinforcing" evidence "demonstrates that land use regulation [wa]s a substantial burden on religious liberty."  Douglas Laycock, *State RFRAs and Land Use Regulation*, 32 U.C. Davis L. Rev. 755, 770 (1999).

The discrimination that prompted RLUIPA was sometimes "by design," sometimes by the regulations' "neutral application," and "sometimes by both."  H.R. Rep. No. 106-219, at 18 (1999).  In other words, the statute addresses both "intentional discrimination caused by abuse in the regulation of land uses" and "'covert' discrimination that was masquerading in the form of neutral zoning laws."  Patricia E. Salkin & Amy Lavine, *The Genesis of RLUIPA and Federalism: Evaluating the Creation of a Federal Statutory Right and its Impact on Local Government*, 40 Urb. Law. 195, 256 (2008).  Congress recognized "a nationwide problem": churches "are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation."  146 Cong. Rec. 16,698, 16,698–99 (2000) (joint statement of Sens. Hatch and Kennedy).

The evidence Congress considered demonstrates "a widespread pattern of discrimination" that commonly occurred in one of two forms: "against churches as compared to secular places of assembly" and "against small and unfamiliar denominations as compared to larger and more familiar ones." 146 Cong. Rec. 16,698, 16,699 (2000) (joint statement of Sens. Hatch and Kennedy); *see also* Laycock, 32 U.C. Davis L. Rev. at 770–71 (describing "vast[] overrepresent[ation]" of "small religious groups"). As to the first, Professor Laycock referenced in his congressional testimony a study in New York City "that shows that churches are [forty-two] times more likely to be landmarked than any other kind of property." *Congress' Constitutional Role in Protecting Religious Liberty: Hearing Before the S. Comm. on the Judiciary,* 105th Cong. 43 (1997) (statement of Douglas Laycock, Professor, University of Texas). The Coalition for the Free Exercise of Religion agreed, reminding Congress that "[t]estimony from across the nation also has demonstrated that nonreligious assemblies are often treated far better by zoning authorities than religious assemblies." 146 Cong. Rec. 16,698, 16,700–01 (2000) (statement of Melissa Rogers, Gen. Counsel, Baptist Joint Comm. on Public Affairs). "For example, recreation centers, health clubs, backyard barbecues and banquet halls are frequently the subjects of more favorable treatment than . . . a church's homeless feeding program or a small gathering of individuals for prayer." *Id.* Second, others highlighted the prevalence of discrimination against religious minorities. Now-President Dallin H. Oaks of the Church of Jesus Christ of Latter-day Saints cited evidence that minority religions experience land-use challenges over five times more frequently than other groups—a "huge disparity." *Religious Liberty Protection Act of 1998: Hearing on S. 2148 Before the S. Comm. on the Judiciary,* 105th Cong. 7 (1998) (statement of Dallin H. Oaks, Elder, Quorum of the Twelve Apostles of the Church of Jesus Christ of Latter-day Saints). Put differently, although religious minorities represent less than nine percent of the general population, they were involved in more than forty-nine percent of the land-use cases considered. *Id.*

RLUIPA's mandate thus seeks to curtail and prevent discrimination against religious groups in all its various forms. As the Supreme Court has recognized, the terms of RLUIPA demonstrate the statute's broad protection for religious liberty. For example, "Congress defined 'religious exercise' capaciously to include 'any exercise of religion'"—even if not an exercise that is "'compelled by, or central to, a system of religious belief.'" *Holt*, 574 U.S. at 358 (quoting 42 U.S.C. § 2000cc-5(7)(A)). Moreover, "Congress mandated that this concept 'shall be construed in favor of a broad protection of religious exercise.'" *Id.* (quoting 42 U.S.C. § 2000cc-3(g)). And Congress recognized that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* (quoting 42 U.S.C. § 2000cc-3(c)). RLUIPA's sweeping protection makes sense in light of the history of pervasive discrimination against churches and other religious organizations in the land-use context.

> ## (2) Congress heard repeated testimony of widespread discrimination in land-use regulation against the religious exercise of churches and organizations who minister to those in need.

The Congressional Record detailing Congress's consideration and enactment of RLUIPA contains extensive testimony and evidence demonstrating the need, in particular, to address repeated instances of discrimination—often prompted by the complaints of other neighborhood residents—against religious ministries exactly like St. Timothy's.

For decades, St. Timothy's Episcopal Church has served those in need in its Brookings, Oregon, community by operating healthcare clinics and providing basic necessities, including food. Complaint ¶ 1. Since 2009, St. Timothy's has offered free meals at lunchtime to the hungry. *Id.* at ¶ 20. The church served meals three or more days per week prior to the COVID-19 pandemic. *Id.* at ¶ 21. After other churches ceased offering meals in response to the pandemic, St. Timothy's increased its lunchtime meal service to six days per week to meet the growing needs of its community. *Id.* at ¶ 23.

Not everyone, however, appreciated the offering of these much-needed services.  Local neighbors complained to the City Council, which responded by deciding that St. Timothy's—despite its longstanding practice, to which the city had never previously objected—was now in violation of the local zoning code.  *Id.* at ¶¶ 30, 39.  The city subsequently adopted a new ordinance requiring local churches to apply for a "conditional use permit" to offer meal services to those in need.  *Id.* at ¶¶ 44–46.  Yet even the permit allows a church to provide meals only twice a week.  *Id.* at ¶ 44.  St. Timothy's thus faces a choice: comply with the ordinance by giving up its religious exercise of providing meals to those in need more than two days a week, or risk facing an enforcement action by continuing this critical ministry.

RLUIPA plainly prohibits local governments from putting religious organizations to such a choice.  Its expansive protection prohibits local governments from abusing existing—or enacting new—land-use regulations to impose a substantial burden on a person's religious exercise, including serving the hungry.  Indeed, Congress enacted RLUIPA in direct response to evidence of repeated instances of discrimination much like this.

Take one example.  The City of Richmond passed an ordinance limiting the number of homeless persons that any church may feed within a seven-day period to no more than thirty.  *Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 6–7 (1998) (statement of Rev. Patrick Wilson III, Trinity Baptist Church of Richmond, Virginia, and the Richmond Affiliate of the Congress of National Black Churches).  Although the ordinance permitted a church to serve more than thirty persons if it applied for—and received in the city's complete discretion—a conditional use permit, the $1,000 application fee exceeded the means of many religious groups.  *Id.* at 7.  A local Baptist minister testified before Congress that the ordinance, which regulated only places of worship, left his church unable to continue to feed thousands of people each year, an exercise which his faith requires.  *Id.*  In his words, the ordinance "restrict[ed] and sometimes prohibit[ed] the exercise of faith and obedience to the word of God" and impermissibly

"require[d] [his church] to pick and choose who we will feed or clothe or shelter." *Id.* at 8; *see also* 146 Cong. Rec. 14,283, 14,285 (2000).

Or another. A Presbyterian congregation in Washington, D.C., had a longstanding practice of feeding the hungry as an exercise of its faith. *Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 17–18 (1998) (statement of Rev. John Wimberly, Jr., Western Presbyterian Church, Washington, D.C.). When the congregation built a new church just six blocks from its original location, neighbors sought to prevent the church from continuing its food ministry at its new location. Laurie Goodstein, *Church Allowed to Open Soup Kitchen in Foggy Bottom; Feeding the Homeless is 'God's Work,' Not Government's Business, Federal Judge Says*, Wash. Post, Apr. 15, 1994, at C03. The local zoning administrator informed the church that, even though the new property was zoned to permit a church as a matter of right, the church needed to obtain a zoning variance to offer its meal service. *Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 17 (1998) (statement of Rev. John Wimberly, Jr., Western Presbyterian Church, Washington, D.C.). After the zoning board denied the church's request for a variance and its appeal, the church sought injunctive relief in federal court. *Id.* The court granted the church's request for a permanent injunction barring the District from interfering with its meal ministry under RFRA, which had not yet been struck down as applied to the states and the District of Columbia. *See W. Presbyterian Church v. Bd. of Zoning Adjustment*, 862 F. Supp. 538, 547 (D.D.C. 1994). In his statement to Congress during the hearings on the need to restore this same protection in RLUIPA following *City of Boerne*, the church's pastor emphasized that, without it, he would face a criminal penalty for his religious exercise because he "simply could not have allowed a government to come in and take out of my hands a plate of food that I'm giving to a hungry person." *Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th

Cong. 18 (1998) (statement of Rev. John Wimberly, Jr., Western Presbyterian Church,
Washington, D.C.).

Neighborhood gripes about ministries that serve the poor are not unusual.  In fact, the
Congressional Record reveals that neighbors—like those of St. Timothy's—often demand
regulatory changes that impermissibly restrict religious exercise like this.  For instance, an inner-
city church in St. Petersburg, Florida, ministered to its community in a variety of ways, including
hosting worship services and bible studies, offering bible-based counseling and a meal program
for the poor and homeless, and organizing a crisis hotline and support groups for those suffering
from addiction and other illnesses.  146 Cong. Rec. E1564, E1566 (daily ed. Sept. 22, 2000)
(statement of Rep. Hyde).  After neighborhood residents complained to zoning officials about the
people whom the church served, the city re-labeled the church from a "church," which was
permitted in its neighborhood, to a "social service agency," which was not.  *Id.*  The city then
ordered the church to relocate—a decision upheld by the zoning appeals board.  *Id.*  A Florida
state court eventually sided with the church, explaining that it was "not doing anything not done,
in one form or another, by churches both in this and other areas[.]"  *Id.*

These are not isolated examples.  Prior to unanimously enacting RLUIPA, Congress held
numerous hearings in which it heard testimony and evidence detailing the "real-life experiences
of those who have had their religious expressions disrupted as a result of substantial burdens
placed by government."  *Protecting Religious Liberty After Boerne v. Flores (Part II): Hearing
Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 2
(1998).  It heard about a city official in Portland, Oregon, who ordered a church to limit
attendance to 70—despite its 500-person capacity—and to shut down a long-running meals
program.  146 Cong. Rec. 14,283, 14,285 (2000).  It learned that the Los Angeles City Council
had rejected an Orthodox Jewish congregation's application for a special-use permit to remain in
a residential zone, even though it permitted other assemblies of schools, book clubs, recreational
uses, and embassy parties.  146 Cong. Rec. 14,283, 14,285 (2000).  And it listened to testimony

about New York City's enforcement of an ordinance requiring an elevator in some buildings to preclude the Missionaries of Charity from operating a homeless shelter in the Bronx. *Protecting Religious Liberty After Boerne v. Flores (Part III): Hearing Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 59 (1998) (statement of Von G. Keetch, Counsel to the Church of Jesus Christ of Latter-Day Saints); *see also Religious Freedom Restoration Act of 1991: Hearings Before the Subcommittee on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 102nd Cong. 149 (1992) (statement of Edward Gaffney, Dean and Professor, Valparaiso University). There are countless more examples in the Congressional Record. *See also, e.g.*, 145 Cong. Rec. 16,216, 16,218–19 (1999); 146 Cong. Rec. 16,698, 16,701 (2000); 146 Cong. Rec. 14,283, 14,283–86 (2000); *Religious Liberty Protection Act of 1998: Hearings on H.R. 4019 Before the Subcommittee on the Constitution of the H. Comm. on the Judiciary,* 105th Cong. 202 (1998) (statement of Rev. Elenora Giddings Ivory, Director, Washington Office, Presbyterian Church (USA)); *cf.* 146 Cong. Rec. E1564 (daily ed. Sept. 22, 2000) (on eve of President Clinton's signing of RLUIPA, submission by Rep. Hyde into record of document prepared by Christian Legal Society describing zoning conflicts between cities and churches that arose after the congressional hearings).

The many accounts of local governments precluding religious organizations from exercising their faith in much the same way as St. Timothy's demonstrate that Congress enacted RLUIPA in response to the very discrimination this case reflects. Indeed, Congress was keenly aware that discriminatory application of land-use regulations—often prompted by the gripes of surrounding neighbors—prevented churches and other houses of worship from ministering to those in need. By enacting RLUIPA, Congress made clear that these acts of ministry are protected religious exercise and that neighbors' complaints about the presence in their communities of services caring for the hungry, homeless, and those otherwise in need do not justify prohibitions on these services; indeed, these complaints often are precisely what make

greater protection of religious exercise necessary.  RLUIPA thus offers broad protection for religious liberty and prohibits the same conduct in which the City of Brookings now engages.

**B.    Federal courts have repeatedly found a substantial burden on religious exercise in violation of RLUIPA in cases just like this one.**

Unsurprisingly, courts across the country have had little trouble concluding that discriminatory application of land-use regulation to target religious organizations' public-service ministries substantially burdens their religious exercise in violation of RLUIPA.  Like here, this discrimination often follows gripes from neighbors, who complain about ministries caring for those most in need by offering food, shelter, and other basic services in their communities.  But Congress knew neighbors often protested churches' provision of these much-needed services, and nonetheless chose to protect religious charitable work in the face of these kinds of complaints.

For example, in Minnesota, neighbors of the First Lutheran Church complained after the church, which had a long-running ministry providing meals and other services to the local homeless, agreed to allow a nonprofit shelter and community center to operate in the church's basement.  *First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 755 (D. Minn. 2018).  The zoning committee responded to the neighbors' complaints by imposing more than a dozen conditions on the operation of the shelter, including a requirement severely limiting the number of guests to be served.  *Id.* at 756–57, 762.  Granting the church's motion for a preliminary injunction, a federal court easily found that the capacity limitation substantially burdened the church's religious exercise in violation of RLUIPA.  *Id* at 762.  The court reasoned that, like the city's ordinance here, the "effects" of the requirement were "not mere inconveniences, but rather put substantial pressure on" the church "to change" its service offerings.  *Id.*  In so holding, the court necessarily determined that the neighbors' complaints did not justify this substantial pressure.

Other courts have also concluded that RLUIPA prohibits a local government from

employing zoning and land-use regulations to coerce a church to limit its religious exercise or otherwise face a penalty. When neighbors discovered that a church-operated religious transition home served adults "in need, particularly those who may be the most shunned in society[,] registered sex offenders," they complained to the county. *See City Walk – Urban Mission Inc. v. Wakulla County Florida*, 471 F. Supp. 3d 1268, 1275 (N.D. Fla. 2020). A Florida district court awarded the church a preliminary injunction after finding that a capacity limitation imposed on the home in response to the neighbors' complaints substantially burdened the church's religious exercise of "serv[ing] everyone regardless of their past" and "help[ing] as many of those in need as it can." *Id.* at 1274. The court recognized that the limitation impermissibly left plaintiff with an impossible "choice: either conform its religious exercise and reduce the number of residents in the [p]roperty by two-thirds, turn away individuals it can help, and evict individuals that it is currently helping; or risk fines and eviction." *Id.* at 1285. Again, the neighbors' gripes about the class of persons served by the church could not justify the burden on its religious exercise.

Outright prohibitions have fared no better. In Connecticut, neighbors complained about a group of homeowners' weekly prayer meetings because of traffic and parking concerns. *Murphy v. Zoning Comm'n of Town of New Milford*, 148 F. Supp. 2d 173 (D. Conn. 2001). After a zoning officer issued a cease-and-desist order to end the meetings in response to these grievances, a court preliminarily enjoined the order. *Id.* at 191. To determine that the order imposed a substantial burden on the homeowners' religious exercise, the court referenced the robust record of evidence of discrimination that was presented to and motivated Congress: "[Forgoing] or modifying the practice of one's religion because of governmental interference or fear of punishment by the government is precisely the type of 'substantial burden' Congress intended to trigger the RLUIPA's protections[.]" *Id.* at 189 (citing exhibit in Congressional Record containing letter from the Coalition for the Free Exercise of Religion, which observed that "[t]estimony from across the nation has also demonstrated that nonreligious assemblies are often treated far better by zoning authorities than religious assemblies"). Indeed, the Ninth

Circuit also has interpreted RLUIPA in light of the widely accepted understanding of Congress's reasons for and purpose in enacting RLUIPA. *See Int'l Church of the Foursquare Gospel v. County of San Leandro*, 673 F.3d 1059 (9th Cir. 2011); *Guru Nanak Sikh v. County of Sutter*, 456 F.3d 978 (9th Cir. 2006).

And, just recently, a district court in California denied the City of Santa Ana's motion to dismiss a religious organization's RLUIPA claim after the city cited a religious organization for distributing food and beverages in violation of its zoning ordinances and refused to grant the organization a certificate of occupancy permitting it to do so. Order Denying Motion to Dismiss, *Micahs Way v. City of Santa Ana*, Case No. 8:23-cv-283-DOC-KES (C.D. Cal. June 8, 2023). The organization had been operating for years without issue, passing city inspection while providing various food-distribution ministries. *Id.* at 2. But after an uptick in neighborhood complaints, the city issued a citation to the organization and informed it that the organization was located in a district in which its food distribution was not permitted. *Id.* at 3–4. The district court concluded that the organization plausibly alleged a substantial burden on its religious exercise under RLUIPA, reasoning that "[d]istributing food is" a "charitable service[]" that "falls within RLUIPA's broad protection of religious exercise" and that the organization plausibly alleged that the city put "'substantial pressure' on it to 'modify [its] behavior and to violate [its] beliefs.'" *Id.* at 7–8 (quoting *Guru Nanak*, 456 F.3d at 988).

Notably, prior to the district court's decision, the Housing and Civil Enforcement Section of the United States Department of Justice's Civil Rights Division and the United States Attorney's Office for the Central District of California submitted a Statement of Interest on behalf of the United States opposing the city's motion to dismiss. *See* Statement of Interest in Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint, Dkt. 25, *Micahs Way v. City of Santa Ana*, Case No. 8:23-cv-283-DOC-KES (C.D. Cal. May 9, 2023) ("Statement of Interest"). The United States emphasized RLUIPA's "broad[] defin[ition]" of "religious exercise," which is "deliberately far-reaching, as evidenced by Congress' intent to distinguish

RLUIPA 'from traditional First Amendment jurisprudence' by 'expand[ing] the reach of the protection to include 'any religious exercise.'"  Statement of Interest at 7 (quoting *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 986 (9th Cir. 2008)); *see also* 42 U.S.C. § 2000cc-5(7)(A).  It further observed that "courts have routinely found that providing charity to homeless individuals—including by offering food and drink—can constitute 'religious exercise' under RLUIPA."  Statement of Interest at 8 (collecting cases).  And, the United States concluded, the threat of "monetary and criminal consequences" facing the religious organization constitutes "substantial pressure" on its protected exercise.  *Id.* at 13.  These positions are firmly grounded in the text and history of the statute and consistent with the weight of authority holding that use of land-use regulations to restrict a religious organization's exercise, including its ministry services, violates RLUIPA.

## III.    <u>CONCLUSION</u>

RLUIPA plainly prohibits the city's discriminatory implementation of its land-use code to preclude St. Timothy's from serving those in need.  Accordingly, *Amicus* respectfully urges this Court to grant summary judgment to St. Timothy's on its RLUIPA claim.

DATED: October 13, 2023.

CABLE HUSTON LLP

By: <u>s/ Casey M. Nokes</u>
Casey M. Nokes, OSB No. 076641
cnokes@cablehuston.com
1455 SW Broadway, Suite 1500
Portland, OR 97201-3412

NOTRE DAME RELIGIOUS
LIBERTY CLINIC

Meredith Kessler, *pro hac vice application pending*
mhollan4@nd.edu
Eck Hall of Law
Notre Dame, Indiana 46556
*Attorneys for Amicus Curiae*
*Notre Dame Religious Liberty Clinic*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I directed the original **BRIEF OF *AMICUS CURIAE* NOTRE DAME LAW SCHOOL RELIGIOUS LIBERTY CLINIC IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record as follows:

Amy Edwards
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
amy.edwards@stoel.com

Rachelle D. Collins
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
rachelle.collins@stoel.com

Samantha K. Sondag
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Samantha.sondag@stoel.com

Tyler J. Killeen
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
tyler.killeen@stoel.com

Franz Bruggemeier
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97205
wfonseca@ojrc.com

Walter Fonseca
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97205
fbruggemeier@ojrc.info

Edward Choi
Bullard Law
200 SW Market Street, Suite 1900
Portland, OR 97201
echoi@bullardlaw.com

Heather Van Meter
Bullard Law
200 SW Market Street, Suite 1950
Portland, OR 97201
hvanmeter@bullardlaw.com

Liani Jeanheh Reeves
Bullard Law
200 SW Market Street, Suite 1900
Portland, OR 97201
lreeves@bullardlaw.com

/ / /

/ / /

/ / /

/ / /

DATED: October 13, 2023.

CABLE HUSTON LLP

By: s/ Casey M. Nokes
    Casey M. Nokes, OSB No. 076641
    cnokes@cablehuston.com
    1455 SW Broadway, Suite 1500
    Portland, OR 97201-3412
    Tele: (503) 224-3092

    NOTRE DAME RELIGIOUS
    LIBERTY CLINIC

    Meredith Kessler, *pro hac vice application pending*
    mhollan4@nd.edu
    Eck Hall of Law
    Notre Dame, Indiana 46556
    Tele: (574) 631-6981

    *Attorneys for Amicus Curiae*
    *Notre Dame Religious Liberty Clinic*