**Amy Edwards**, OSB No. 012492
amy.edwards@stoel.com
**Samantha K. Sondag**, OSB No. 154244
samantha.sondag@stoel.com
**Rachelle D. Collins**, OSB No. 214059
rachelle.collins@stoel.com
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380

**Walter Fonseca**, OSB No. 136349
wfonseca@ojrc.info
**Franz Bruggemeier**, OSB No. 163533
fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503.944.2270

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **ST. TIMOTHY'S EPISCOPAL CHURCH**, by and through **THE DIOCESE OF OREGON**, DBA **THE EPISCOPAL DIOCESE OF OREGON**, an Oregon non-profit corporation, and **REVEREND JAMES BERNARD LINDLEY**, vicar of St. Timothy's Episcopal Church,<br><br>        Plaintiffs,<br><br>   v.<br><br>**CITY OF BROOKINGS**, an Oregon municipal government,<br><br>        Defendant. | Case No. 1:22-cv-00156-CL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. RESPONSE TO CITY'S STATEMENT OF FACTS ....................................... 2

    A.    Facts Not in Dispute ................................................................................ 2

    B.    Unsupported or Contradicted Factual Assertions. ................................. 5

III. ARGUMENT ................................................................................................... 13

    A.    Legal Standard. ...................................................................................... 13

    B.    City's Motion #1 Fails: RLUIPA Applies and the Ordinance Does Not Withstand Scrutiny. ..................................................................... 14

        1.    The Ordinance Imposes Individualized Assessments. .............................. 14

            a.    The Ordinance Implements an Individualized Assessment Regime. ................................................................ 14

            b.    The Ordinance Is the Result of an Individualized Assessment ..... 15

            c.    42 U.S.C. § 2000cc(a)(2)(B) Also Applies to the Ordinance. ...... 16

            d.    This Case Has Nothing to Do with an ORS Definition of "Restaurant." .......................................................................... 17

        2.    The Ordinance Substantially Burdens Plaintiffs' Religious Exercise. ..... 18

            a.    Religious Exercise. ...................................................................... 18

            b.    Substantial Burden. ..................................................................... 20

        3.    The Ordinance Is a Burden Imposed by the City ...................................... 23

        4.    The Ordinance Was Not the Least Restrictive Means to Achieve Any Compelling Government Interest. ...................................................... 24

    C.    City's Motion #2 Fails: The Ordinance Violates the Free Exercise Clause. ........ 26

    D.    City's Motion #3 Fails: The Ordinance Prohibits Expressive Conduct. .............. 28

    E.    City's Motion #4 Fails: The Ordinance Is Unconstitutionally Vague and Overbroad. ......................................................................................... 30

F.   City's Motion #5 Fails: The Ordinance Violates Article I, Sections 2 and 3 of the Oregon Constitution........................................................................ 32

    1.   The Ordinance Does Not Withstand Exacting Scrutiny. ......................... 32

    2.   Plaintiffs' Challenge is not to Zoning Laws in General. ......................... 33

G.   City's Motion #6 Fails: The Ordinance Violates Article I, Section 8 of the Oregon Constitution. ........................................................................ 34

IV. CONCLUSION............................................................................................ 35

**TABLE OF AUTHORITIES**

**Cases**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)................................................................................................13

*Baer v. City of Bend*,
    206 Or. 221 (1956)..........................................................................................33, 34

*Barnes v. Glen Theatre, Inc.*,
    501 U.S. 560 (1991)................................................................................................28

*Bell v. Keating*,
    697 F.3d 445 (7th Cir. 2012) ................................................................................32

*Brown v. State of Louisiana*,
    383 U.S. 131 (1966)................................................................................................29

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*,
    213 F.3d 474 (9th Cir. 2000) ................................................................................13

*Chosen 300 Ministries, Inc. v. City of Philadelphia*,
    No. CIV.A. 12-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) ........................19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)................................................................................................26

*Church on the Rock v. City of Albuquerque*,
    84 F.3d 1273 (10th Cir. 1996) ..............................................................................28

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986)..................................................................................................29

*Civil Liberties for Urban Believers v. City of Chicago*,
    342 F.3d 752 (7th Cir. 2003) ................................................................................22

*Congregation Etz Chaim v. City of Los Angeles*,
    No. CV10-1587 CAS EX, 2011 WL 12472550 (C.D. Cal. July 11, 2011) ............21

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 530 (1980)................................................................................................29

*Cornerstone Bible Church v. City of Hastings*,
    948 F.2d 464 (8th Cir. 1991) ................................................................................30

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*,
    218 F. Supp. 2d 1203 (C.D. Cal. 2002) ....................................................14, 17, 26

    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
                 JUDGMENT

*DiLaura v. Twp. of Ann Arbor*,
  112 F. App'x 445 (6th Cir. 2004) (unpublished) .................................................21

*Emp. Div. v. Rogue Valley Youth for Christ*,
  307 Or. 490, 770 P.2d 588 (1989) ......................................................................33

*Episcopal Student Found. v. City of Ann Arbor*,
  341 F. Supp. 2d 691 (E.D. Mich. 2004)..............................................................23

*Fulton v. City of Phila.*,
  141 S. Ct. 1868 (2021)..................................................................................24, 25

*Gonzales v. O Centro Espirita Beneficente Uniao
  do Vegetal*, 546 U.S. 418 (2006)........................................................................24

*Grace United Methodist Church v. City of Cheyenne*,
  451 F.3d 643 (10th Cir. 2006) .............................................................23, 24, 26

*Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*,
  456 F.3d 978 (9th Cir. 2006) ........................................................................20, 22

*Harbor Missionary Church Corp. v. City of San Buenaventura*,
  642 F. App'x 726 (9th Cir. 2016) (unpublished) ......................................19, 21, 24

*Hernandez v. Comm'r Internal Revenue*,
  490 U.S. 680 (1989)............................................................................................20

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
  515 U.S. 557 (1995).............................................................................................28

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
  673 F.3d 1059 (9th Cir. 2011) .....................................................................20, 22, 24

*Jesus Center v. Farmington Hills Zoning Bd. of Appeals*,
  215 Mich. App. 54, 544 N.W.2d 698 (1996) ........................................................21

*State ex rel. Juvenile Dep't of Polk Cnty. v. Tucker*,
  83 Or. App. 330, 731 P.2d 1051 (1987)...............................................................33

*Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*
  699 F.2d 303 (6th Cir. 1983) ..............................................................................23

*Love Church v. City of Evanston*,
  896 F.2d 1082 (7th Cir. 1990) ............................................................................22

*Martin v. Houston*,
  196 F. Supp. 3d 1258 (M.D. Ala. 2016) .........................................................15, 16

*Mast v. Cnty. of Fillmore*,
 993 N.W.2d 895 (Minn. Ct. App. 2023), *rev. granted* (Oct. 17, 2023)..................................25

*Mast v. Fillmore Cnty., Minn.*,
 141 S. Ct. 2430 (2021) (Gorsuch, J. concurring)...............................................................24, 25

*Michah's Way v. City of Santa Ana*,
 No. 823-cv-00183, 2023 WL 4680804 (C.D. Cal. June 8, 2023)..........................17, 19, 20, 21

*Midrash Sephardi, Inc. v. Town of Surfside*,
 366 F.3d 1214 (11th Cir. 2004) ............................................................................................15, 23

*Milwaukie Co. of Jehovah's Witnesses v. Mullen*,
 214 Or. 281 (1958)...................................................................................................................33

*Nat'l Endowment for the Arts v. Finley*,
 524 U.S. 569 (1998)..................................................................................................................32

*New Harvest Christian Fellowship v. City of Salinas*,
 29 F.4th 596 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) ..........................................24

*Papachristou v. City of Jacksonville*,
 405 U.S. 156 (1972)..................................................................................................................31

*Porter v. California Dep't of Corr.*,
 419 F.3d 885 (9th Cir. 2005) ...................................................................................................14

*San Jose Christian College v. City of Morgan Hill*,
 360 F.3d 1024 (9th Cir. 2004) .................................................................................................21

*Santopietro v. Howell*,
 73 F.4th 1016 (9th Cir. 2023) ..................................................................................................28

*Shakur v. Schriro*,
 514 F.3d 878 (9th Cir. 2008) ...................................................................................................20

*Spirit of Aloha Temple v. Cnty. of Maui*,
 322 F. Supp. 3d 1051 (D. Haw. 2018)......................................................................................24

*State v. Babson*,
 355 Or. 383 (2014)....................................................................................................................35

*State v. Ciancanelli*,
 339 Or. 282 (2005)....................................................................................................................34

*State v. Hickman*,
 358 Or. 1, 358 P.3d 987 (2015) ...............................................................................................32

121368297.9 0076396-00001

*State v. Rich,*
    218 Or. App. 642 ....................................................................................................34

*State v. Robertson,*
    293 Or. 402 (1982)..............................................................................................34, 35

*Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,*
    396 F.3d 895 (7th Cir. 2005) ...............................................................................22

*Texas v. Johnson,*
    491 U.S. 397 (1989)......................................................................................28, 29, 30

*United States v. Grassie,*
    237 F.3d 1199 (10th Cir. 2001) ...........................................................................17

*United States v. Williams,*
    553 U.S. 285 (2008) ..............................................................................................32

*W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.,*
    862 F. Supp. 538 (D.D.C. 1994) ..........................................................19, 20, 28, 29

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989).........................................................................................29, 30

*Westchester Day Sch. v. Vill. of Mamaroneck,*
    504 F.3d 338 (2d Cir. 2007).................................................................................17

*Widmar v. Vincent,*
    454 U.S. 263 (1981).............................................................................................28

*Wormuth v. Lammersville Union Sch. Dist.,*
    305 F. Supp. 3d 1108 (E.D. Cal. 2018)..............................................................13, 14

**Statutes**

42 U.S.C. § 2000cc-2.......................................................................................................24

42 U.S.C. § 2000cc-5..................................................................................................18, 19

42 U.S.C. § 2000cc ................................................................................................ *passim*

BMC 17.08.020.................................................................................................................4

BMC 17.124.050...............................................................................................................4

BMC 17.20.040.....................................................................................................4, 18, 27

ORS 624.010..............................................................................................................9, 10

ORS 624.038 ....................................................................................................................10

**Rules**

Fed. R. Civ. P. 56(c) .....................................................................................................5, 13

121368297.9 0076396-00001

## I.  INTRODUCTION

Bereft of record support, Defendant City of Brookings ("City") reinvents history and imagines new facts in its Motion for Summary Judgment ("Motion").  Plaintiff St. Timothy's Episcopal Church ("St. Tim's"), in the City's telling, is a restaurant no different from McDonald's—not a church with a sincere religious belief in feeding the hungry and ministering to the poor.  According to the City, Ordinance 21-O-795, adopted in 2021 ("Ordinance"), is a regulation that "allows" St. Tim's and other Brookings churches to serve meals on their properties—not an arbitrary restriction on the benevolent feeding ministries that those churches had operated, with the City's permission, for more than 10 years.  The City predicts that if Plaintiffs succeed in striking the Ordinance, then *all* free meals at churches will end because the land use code "will remain in place."  To believe the City's characterization, this outcome will be *Plaintiffs'* fault—not the fault of the City that amends and enforces that very same code.

Neither the record nor the law supports the City's story.  The undisputed facts show that the City designed the Ordinance for the purpose of restricting religious exercise—St. Tim's' in particular—without any basis to do so. Plaintiffs believe they have a mandate from Christ to feed the hungry when they need to be fed, and the Ordinance substantially burdens their ability to fulfill that call. Because the City's actions violate the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the state and federal constitutions, its Motion should be denied.

Plaintiffs' Opposition to the City's Motion is supported by the Declaration of Samantha Sondag ("Sondag Opp. Dec."), the Declaration of Rev. James Bernard Lindley ("Lindley Opp. Dec."), and the pleadings and records on file.  Plaintiffs incorporate by reference their Motion for Summary Judgment (Dkt. 43) ("Plaintiffs' Motion" or "Plfs' MSJ") and all supporting declarations and exhibits (Dkts. 44-51),[1] as if fully set forth herein.

---

[1] The Declarations of Samantha Sondag and Rev. James Bernard Lindley in Support of Plaintiffs' Motion (Dkts. 48, 51) are referred to herein as the "Sondag MSJ Dec." and "Lindley MSJ Dec."

## II.  RESPONSE TO CITY'S STATEMENT OF FACTS

**A.    Facts Not in Dispute.**

The parties agree on the following: St. Tim's has been located in Brookings since long before the City adopted its land use code in 1989 (the "Code").  Mot. at 12; Plfs' MSJ at 2-3. After adopting the Code, the City placed St. Tim's' neighborhood in a residential zone, where churches are permitted conditional uses.  As a result of its grandfathered status, St. Tim's has a *de facto* conditional use permit pursuant to which it has operated as a church continuously since the Code's enactment.  Mot. at 12; Plfs' MSJ at 3.  All churches in Brookings are located in residential zones.  Howard Dep. Ex. 3 at 3.[2]

In or around 2009, various churches in Brookings, including St. Tim's, coordinated to serve meals for free to the needy, with a goal of serving a meal every day of the week. Mot. at 13.  Ron Hedenskog, who was then a City Councilor and, until November 13, 2023, the Brookings Mayor,[3] was a kitchen manager for St. Tim's for approximately 10 years, from 2009 to 2018 or 2019.  *Id.*; Sondag Opp. Dec. Ex. 1 (Hedenskog Supp. Dep. 20:25-21:10).  Prior to 2009, St. Tim's hosted a food bank on its premises.  Mot. at 13.

After the COVID-19 pandemic began, the City adopted Temporary Emergency Rule 2020-1 ("Rule 2020-1"), which permitted individuals to sleep in their cars at religious institutions.  Mot. at 14-15; *see also* Plfs' MSJ at 6.  St. Tim's was the only institution to apply for and receive a Rule 2020-1 permit.  Mot. at 15; Plfs' MSJ at 6.  The Rule 2020-1 program was

---

[2] Except as otherwise noted, "Howard Dep." refers to Sondag MSJ Dec. Ex. 1, "Lindley Dep." to Sondag MSJ Dec. Ex. 2, "Hedenskog Dep." to Sondag MSJ Dec. Ex. 3, "Baron Dep." to Sondag MSJ Dec. Ex. 4, "Akiyama Dep." to Sondag MSJ Dec. Ex. 5, "Schreiber Dep." to Sondag MSJ Dec. Ex. 6, and "Dotson Dep." to Sondag MSJ Dec. Ex. 7.

[3] Mr. Hedenskog resigned as Mayor following the publication of unofficial results from a recall election.  *See* Sondag Opp. Dec. ¶ 2.

Page 2    -    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
               JUDGMENT

challenging to manage.  *See* Mot. at 15; MSJ at 6; Van Meter Dec. Ex. A (Lindley Dep.132:1-11); Compl. ¶ 26.[4]  Rev. Lindley (or "Fr. Bernie") himself called the police for assistance in managing the City's Rule 2020-1 program.  Mot. at 14.  During the pandemic, St. Tim's also responded to decreased meals available in Brookings by increasing service, at one point to six days per week.  Hedenskog Dep. Ex. 25; Sondag Opp. Dec. Ex. 7 (Tr. 13:17-14:7).

On April 12, 2021, two months before the Rule 2020-1 program ended (*see* Howard Dep. Ex. 4), the City Council received a petition titled "Petition to Remove Homeless from St. Timothy Church" (the "Petition").  Mot. at 15; Plfs' MSJ at 7.  The Petition requested that the City "reconsider allowing vagrants to continue to live and congregate at St. Timothy's Church" and attributes the behavior to "hostile individuals" who "should not be allowed to camp in a community for concerns of safety and the well-being of other citizens."  Howard Dep. Ex. 3 (emphasis added).  The "action petitioned for" was to "remove the homeless encampment and prevent the congregation of vagrants or undesirables at St. Timothy Church."  *Id.*  The Petition did *not* attribute the identified behavior to "services at St. Timothy's," as the City incorrectly states in its Motion.  Mot. at 15.

Several City Council workshops and meetings followed, allegedly in response to the Petition.  *Id.* at 17.  Although the Petition did not discuss meals provided at St. Tim's, the City meetings focused on St. Tim's' feeding ministry and, for the first time, the City took the position that St. Tim's was operating a "restaurant" when it fed the needy without charge.  *Id.* at 16.  Because restaurants are not permitted in residential zones, the City claimed that St. Tim's' feeding ministry was not operating "legal[ly.]"  Mot. at 16-17.

---

[4] Although not relevant to summary judgment, Plaintiffs dispute that any "admission" contradicts paragraph 26 of the Complaint.  Mot. at 15. The City has presented no evidence of contradiction.

On October 25, 2021, the Brookings City Council adopted the Ordinance, which created a new conditional use in residential zones: "benevolent meal service." Brookings Municipal Code ("BMC") 17.08.020 (B Terms), 17.20.040.V, 17.24.040.V, 17.28.040.T, and 17.124.050 (the Ordinance). Mot at 17. The Ordinance defined "benevolent meal service" as "a periodic food service operation that provides food to the public without charge," BMC 17.08.020, and provided that charitable organizations could obtain a permit to serve benevolent meals "up to two days per week between the hours of 9:00 a.m. and 5:00 p.m.," with "[n]o meal service . . . last[ing] more than three hours per day," BMC 17.124.050. A City Staff Report described the Ordinance as a "method for allowing benevolent meal services in *churches*, in a residential zone[.]" Howard Dep. Ex. 12 at 3 (emphasis added).

Recently, on November 7, 2023, the Brookings Planning Commission recommended changing the Ordinance to increase the number of days providers could serve free meals from two to three, and decrease the number of hours of each service from three to two. Sondag Opp. Dec. Ex. 2 at 12. Fr. Bernie submitted a letter to the Commission noting Plaintiffs' continued objections to the limitations. Lindley Opp. Dec. Ex. 1. On November 13, 2023, the City Council voted to adopt the amended ordinance on a first reading by title only. Sondag Opp. Dec. ¶¶ 2, 5, Ex. 3.[5] Again, Fr. Bernie noted Plaintiffs' objection. Lindley Opp. Dec. Ex. 2. At the City Council meeting, staff explained that a reason for the change was Plaintiffs' "attorney's summary judgment." *Id.* ¶

---

[5] Because a second City Council reading and mayoral signature are required for adoption, and because the City violated its notice procedures in pushing the legislation so rapidly, Plaintiffs do not believe the amended ordinance is currently adopted. Brookings Charter, ch. VIII, § 31(1); Sondag Opp. Dec. Ex. 4. As described herein, the Ordinance is unlawful whether it restricts churches to serving meals on two or three days; indeed, the limited comment on and explanation for this rushed legislation emphasizes the arbitrariness of its key components.

Page 4    -    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Currently, St. Tim's offers meals without charge three to four times per week. Mot. at 15. St. Tim's is enrolled in the City's Property Watch Program, which is available to owners of properties other than single residential homes, and authorizes police to trespass unauthorized individuals.  Mot. at 14; *See* Sondag Opp. Dec. Ex. 5 ("Dotson Supp. Dep." 41:22-42:8). St. Tim's welcomes City police, including the Community Resources Officer ("CRO"). Mot. 14.

## B.    Unsupported or Contradicted Factual Assertions.

In several instances, the City's Statement of Facts misstates and/or mischaracterizes the record.  Because such materials "do not establish the absence . . . of a genuine dispute" and because the City "cannot produce admissible evidence to support" these allegedly "undisputed" facts, they do not support summary judgment in the City's favor.  Fed. R. Civ. P. 56(c)(1)(B).

> <u>City's Assertion ¶ 1</u>: "Nothing in the Episcopal Church tenets of faith or scriptures or sacraments requires benevolent meal services to be served on site at St. Timothy's, or at all . . . only three or four of the approximately 69 churches within the Diocese provide benevolent meal services at all."  Mot. at 11 (citing testimony of Fr. Bernie and Bishop Akiyama).

<u>Response</u>:  The City's cited authority contradicts its assertion. Fr. Bernie testified that the Bible makes "clear that [Jesus's] intention was that we would feed, clothe, welcome, heal . . . like the latter half of [the Book of Matthew] Chapter 25."  Lindley Dep. 150:11-153:13. Bishop Akiyama testified that "providing food or drink to members of the public" is "at the heart of . . . our Christian call . . . [i]n the sense that we have been given a *mandate* by Jesus Christ as stated in the scriptures to feed the hungry, clothe the naked, to comfort the afflicted."  Van Meter Dec. Ex. B (Akiyama Tr. 39:24-40:7).[6]

Bishop Akiyama testified that each Episcopal church is "called to fulfill its mission to

---

[6] Because feeding the hungry is a core tenant of Plaintiffs' use of the property as a church, Plaintiffs do not agree that the meal program was a "new use" of the church in 2009.  *Compare* Mot. at 13 (¶ 5); *with, e.g.*, Lindley MSJ Dec. ¶ 2; Zellmer MSJ Dec. ¶¶ 6-7.

Page 5    -    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

serve those in need in a way that meets with their context, their congregation, and their sense of

call." *Id.*, Ex. B (41:1-9). Similarly, Fr. Bernie explained that "feeding people is a central tenet,

and how that happens depends on the context of each individual parish." *Id.*, Ex. A (Lindley Tr.

154:10-155:20). At St. Tim's, one of the ways that happens is the feeding ministry, which Fr.

Bernie believes reflects his sacramental call. *Id.*, Ex. E (36:18-37:1). When Plaintiffs "feed

people who are hungry, [they] do that as a function of [their] church. . . . It's an expression of

[their] faith." *Id.*, Ex. A (Lindley Tr. 125:16-126:14). Plaintiffs sincerely believe that people

"must be fed when they are hungry." Sondag Opp. Dec. Exs. 6, 7 (Tr. 16:18-19); Lindley Opp.

Dec. Ex. 2; *see also* Lindley MSJ Dec. ¶¶ 2, 4, 8.

How other churches fulfill Christ's mandate is irrelevant to Plaintiffs' claims. *See* Van

Meter Dec. Ex. A (Lindley Tr. 154:10-155:20), Ex. B (Akiyama Tr. 41:1-9). Moreover, the City

has presented no admissible evidence regarding the number of churches within the Diocese that

"provide benevolent meal services." Neither Fr. Bernie nor Bishop Akiyama is aware of how

every Episcopal church in Oregon serves their community, and the City laid no foundation to the

contrary. *See id.*, Ex. A (Lindley Tr. 153:14-154:6), Ex. B (Akiyama Tr. 42:17-43:1, 74:4-13).

> City's Assertion ¶ 2: "Fr. Lindley admits that he has in the past searched for other
> property for benevolent meal services and other services but at the time did not
> find anything suitable, and he has not looked recently. Notably, just since
> 2020/21, St. Timothy's has received over $500,000 in grants from Oregon Health
> Authority and other groups, and Fr. Lindley himself owns unused commercial
> property. St. Timothy's also could request money from the Diocese but has not
> done so." Mot. at 12 (citations omitted).

> Response: The City mischaracterizes Fr. Bernie's deposition testimony. He testified that

former Mayor Hedenskog "looked into finding space off the church grounds" and found "no

cost-effective options available." Lindley Dep. 112:11-113:7. Mayor Hedenskog "consulted"

with Fr. Bernie during his search. *Id.*

Page 6    -    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

As to the Oregon Health Authority ("OHA") grant, the City selectively omits that the $410,000 grant was earmarked specifically for the initiation and maintenance of a COVID response clinic. Sondag Opp. Dec. Ex. 8 ("Lindley Supp. Dep." 100:21-101:4). As a matter of law, that money *could not* be used for purposes other than the COVID clinic, such as public "meals" or to help "city police . . . address public safety problems," as the City suggests. Mot. at 12, 14 n. 5. Indeed, documents that the City obtained from OHA through subpoena, which are conspicuously absent from the Motion, make clear that St. Tim's was obligated to spend those funds consistent with the approved budget for COVID response. Sondag Opp. Dec. ¶ 11, Ex. 9 at 13; *see also* Van Meter Dec. Ex. D at 2 (showing segregated OHA grant funds). Some of the OHA grant was used to pay individuals who assisted specifically with the COVID clinic, including healthcare professionals (*see* Lindley Supp. Dep. 57:21-60:6), not as general "wages to church volunteers," as the City states. Mot. at 12 n.3.

Finally, the City misrepresents the status of Fr. Bernie's "commercial property" as "unused." Mot. at 12. Fr. Bernie purchased the property with his father in a foreclosure eight years ago so that the former owner would not lose his home. Lindley Supp. Dep. 21:14-23:21. That individual still lives there and, because of Fr. Bernie's generosity, is not homeless. *Id.*

> City's Assertion ¶ 5: "Between 2010 and 2020, police activity at St. Timothy's increased dramatically, and the number of dispatch calls for police services at St. Timothy's went from 8 to 154. These counts are only for police calls to St. Timothy's address, and do not include calls to neighboring properties or the adjacent Azalea Park. All other churches providing benevolent meal services also had statistically significant police call increases in this timeframe." Mot. at 14 (citing Van Meter Dec. Exs. F, G, H, I).

> Response: The City's Exhibit H consists of summary pages of 2020 police incident reports purportedly involving St. Tim's or its address. These pages were part of a larger document produced by the City that included the underlying incident reports, on which the

June 7, 2021 Workshop Agenda statistics (City's Exhibit G; Howard Dep. Ex. 3) were allegedly based. *See* Sondag Opp. Dec. Ex. 10; Dotson Supp. Dep. 66:21-68:10. The underlying reports ("2020 Incident Reports"), omitted from the City's Exhibit H, are informative.

**First,** the 2020 Incident Reports reveal that approximately one-third of the "counts" summarized in City Exhibit H were *not* "calls for police services" or "police calls to St. Timothy's address" (Mot. at 13-14), but rather reports of activity elsewhere and/or non-criminal events such as requests for medical attention and police-initiated patrols. Sondag Opp. Dec. ¶ 13; *see also* Dotson Supp. Dep. 60:17-61:6, 65:2-8 (describing "Information" and "Area check" terms ); 43:24-45:24 (describing "reporting party" and "complainant"); 65:9-19 (describing "Salvation Army" offense category).

**Second,** the 2020 Incident Reports leave no question that the City's claim of a "statistically significant police call increases" associated with "benevolent meal services" is incorrect. *See* Mot. at 14. As a threshold matter, the City omitted data regarding police calls in Brookings generally from the June 2021 Workshop Agenda, precluding an assessment as to whether the increase was statistically significant as compared to the City as a whole. More critically, however, City officials never identified which reports occurred when "benevolent meals" were served. Dotson Dep. 69:4-5. Had they done so, they would have seen that only **seven** calls listed in City Exhibit H occurred during the hours/days when St. Tim's served meals after the COVID-19 pandemic began. *See* Lindley MSJ Dec. ¶¶ 7-8. Moreover, none of the reports reference the meal service: one is a request for an ambulance (Sondag Opp. Dec. Ex. 10 at 190); two were police-initiated patrols without event (*id.* at 42, 46); one was a search for a man last seen *behind* St. Tim's (*id.* at 240); one was a call complaining about camping (*id*. at 198); one was a complaint about loud music (*id.* at 97); and one was for disorderly conduct in

front of the church (*id.* at 11).

> City's Assertion ¶¶ 11, 12: "City of Brookings Mayor Ron Hedenskog took a keen interest in ensuring that benevolent meal services would continue, having volunteered to manage the benevolent meal services at St. Timothy's Episcopal Church from the beginning in 2009 and for an entire decade . . . . While city officials looked into the matter presented in the 29 citizens' petition and citizen complaint letter, city officials determined that no 'restaurant' was allowed in residential zones of the city, for profit or not, benevolent or otherwise, either outright or with a conditional use permit. 'Restaurant' is defined by the State of Oregon in ORS 624.010(9)(a) as an "establishment where food or drink is prepared for consumption by the public" . . . In other words, city officials determined that St. Timothy's and other entities providing benevolent meal services in residential zones were already violating city land use ordinances." Mot. at 16 (citations omitted).

> Response: The record leaves no question that the City "looked into" labeling St. Tim's as

a restaurant long *before* receiving the April 2021 Petition. As described in Plaintiffs' Motion,

Mayor Hedenskog first raised the concept in July 2020, suggesting that St. Tim's was a

"restaurant" acting beyond the scope of its "church CUP." Plfs' MSJ at 9; Hedenskog Dep.

Ex. 25. In August 2020, Mr. Baron suggested that categorizing St. Tim's as a restaurant would

help the City "challenge . . . St. Tim's de facto Conditional Use Permit" and allow the City to

place new "conditions" on its religious ministry. Baron Dep. Exs. 36, 37. In February 2021, the

City's legal counsel emailed the Curry County Public Health Department requesting that the

Department "review the activities" of St. Tim's because it believed "restaurant" regulations

should apply. Sondag MSJ Dec. Ex. 13.

At the June 7, 2021 Workshop, the City stated publicly for the first time that "staff had

concluded that the church was 'operating a commercial kitchen without a permit.'" Howard

Dep. Ex. 3 at 4. In response, St. Tim's reached out to OHA. *See* Lindley MSJ Dec. ¶ 11. A

month later, OHA approved the church's commercial kitchen application, and the City Manager

responded by advising the Public Works Director to issue a letter "ASAP that says a restaurant is

Page 9    -    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

not allowed in [a] residential zone." Howard Dep. Ex. 11. This happened on July 29, 2021.

Howard Dep. Ex. 7 at 1. In other words, the City only announced its determination that church

feeding ministries were "restaurants" disallowed in residential zones after St. Tim's obtained the

license, at the City's urging, that the City claimed made St. Tim's a restaurant.

This sequence of events, which is not subject to genuine dispute, does not reflect a "keen

interest in ensuring that benevolent meal services would continue," as the City states. *See* Mot.

at 16. To the contrary, in the very same meeting that the City cites for this assertion, Mayor

Hedenskog expressed an interest in *limiting* these services because he did not consider them to

fall within the "normal operations of a church":

> We had no intention of interfering in the normal operations of a church or other
> nonprofit organizations, regular routines. So, *we understand that the churches use
> their kitchens for Sunday mornings or Saturday mornings, whatever it is*, when
> they're serving their congregation. *We have no intention of interfering with those.*
> Or holidays, some churches serve extra meals for the public on holidays as in
> Thanksgiving. We don't -- we're not interested  in interfering with any of that.
> *It's this -- it's a benevolent meal site that has picked up . . . .*

Van Meter Dec. Ex. E at 13-14 (emphases added).

Furthermore, the definition of "restaurant" from ORS 624.010, which concerns public

health in food service facilities, is not incorporated into or relevant to Brookings' Code. Even if

it were, chapter 624 *contradicts* the City's claim that St. Tim's is a "restaurant," as it expressly

omits "establishments where food is prepared and served by a . . . religious organization" from

ORS 624.010 requirements for restaurants. ORS 624.038(1). Plaintiffs incorporate this response

to City's Assertion ¶ 13.

> City's Assertion ¶ 14:  ". . . Unlike other attendees representing entities providing
> benevolent meal services, St. Timothy's did not provide feedback on the actual
> ordinance, such as stating their requested number of days and hours for operating
> benevolent meal services, rather they declared they would file suit. Mot. at 17.

> Response: Contrary to the City's unsupported assertion, St. Tim's provided extensive

feedback on the Ordinance.  In the August 30, 2021 meeting cited by the City, Fr. Bernie informed City Council that St. Tim's was serving meals "five days a week" and disagreed that the City could "tell [the] church that it can only administer sacraments on a particular day when it has administered sacraments on seven days a week for many, many years."  *See* Van Meter Dec. Ex. E (Tr. at 33:13-16, 36:7-11).

Fr. Bernie also participated in the June 7, 2021 Workshop Meeting, during which he explained the church's inspection history in response to the City's purported concerns about food safety: "We were inspected about a year ago . . . and we passed that inspection. And more recently, we were inspected by the Oregon Food Share program . . .  we had to pass inspection from them as well. And so we have every confidence that we'll pass another inspection." Sondag Opp. Dec. Ex. 11 (Tr. 38:25-39:9).

At the October 5, 2021 Planning Commission meeting, Fr. Bernie described how his church had changed its ministry schedule during the pandemic to meet community needs, when other churches stopped offering no-cost meals: first to six days at the height of the pandemic, then to five days, and hopefully to four days if another church started feeding meals.  *Id.*, Ex. 7 (Tr. 13:17-14:7).  He explained that the proposed Ordinance failed to accommodate the church's calling to "feed people when they're hungry."  *Id.* (Tr. 16:17-19).  The City is simply incorrect when it asserts that "[t]he ordinance was drafted to not only meet but exceed the requests by benevolent meal service providers for numbers of days and hours."  Mot. at 17-18.

In addition to Father Bernie's oral testimony, the Diocese sent the City multiple letters commenting on the Ordinance.  In June 2021, the Diocese's Chancellor explained the importance of St. Tim's feeding ministry, noting that "when government has not stepped in, for whatever reason, St. Timothy's has heeded Jesus's call to feed all of the hungry of the community of

Brookings." Sondag Opp. Dec. Ex. 12 at 2. Less than two months later, he reiterated that feeding is a sacrificial act for Christians, the contemplated restriction of which was unlawful: "the poor and elderly may not 'potentially' be fed on the City's arbitrary 'frequency and volume' preferences. They, and all of them, must be fed when they are hungry." *Id.*, Ex. 6 at 1-2. Far from "declar[ing] they would file suit" (Mot. at 17), Chancellor Dotten extended an invitation: "I would be happy to meet with your City Attorney to discuss how the church and the City of Brookings might work together to further mitigate the impacts of the broader community from homelessness." Sondag Opp. Dec. Ex. 12. at 3. The City did not accept.

In advance of the October 5, 2021 Planning Commission meeting, the Diocese wrote the City again explaining how the Ordinance was an unlawful burden on Plaintiffs' religion. Sondag Opp. Dec. Ex. 13. Among other things, Bishop Akiyama "urge[d] that the Planning Commission recommend that the City Council reject its cruel proposed Code change" and stated that Plaintiffs did not intend to comply with a law "that seeks to deprive God's people from participating in the Body of Christ through denying them food." *Id.* After the City again failed to heed Plaintiffs' requests, Bishop Akiyama advised the City of potential legal action if the Ordinance was not repealed. Akiyama MSJ Dec. ¶ 4, Ex. 3.

> City's Assertion ¶ 15: "Fr. Lindley's and Bishop Akiyama's objection to the Ordinance is based on the fact that there is any permit required at all; in their view, the only permits that should be allowed are the permits that are agreeable to the church." Mot. at 17 (citations omitted).

> Response: At no point did either Fr. Bernie or Bishop Akiyama provide such testimony;

to the contrary, when asked if it is "okay for cities to require permits of congregations within the Diocese of Oregon," Bishop Akiyama responded "*generally speaking, yes*" but that the Ordinance was problematic because "it interferes with St. Timothy's capacity to feed the hungry." Van Meter Dec. Ex. B (Akiyama Tr. 52:22-53:16) (emphasis added). Far from

asserting that no permits should be "required at all," Fr. Bernie obtained one from OHA immediately before the City adopted the Ordinance. He distinguished that permit, which serves the legitimate interest of "creat[ing] opportunities for people to be fed healthy food, safe, healthy food," from the Ordinance, which does not. *Id.*, Ex. A (Lindley Tr. 141:12-21).

> <u>City's Assertion ¶ 17</u>: To date, the permit process has helped to successfully reduce the number of public safety and health and welfare issues at the benevolent meal services sites, except at St. Timothy's. Van Meter Dec. Ex. I (Dotson Dep. 84:5-89:9). St. Timothy's continues to be a major source of police calls and policing needs in the City of Brookings. *Id.* at 84:5-84:18; Mot. at 18.

> <u>Response</u>: The City mischaracterizes Lieutenant Dotson's testimony, which itself is not

based on objective evidence. The City's counsel asked whether Lieutenant Dotson had, in his personal capacity, observed "problems with homeless or transient people" at the church across the street from his home, which has a benevolent meal service CUP. Van Meter Dec. Ex. I (Dotson Tr. 84:19-85:9). He responded, "I would say they have far, far fewer problems" than St. Tim's. *Id.* at 85:10-14. Nothing in this testimony supports the broad supposition that the Ordinance has resulted in a reduction of "public safety or health and welfare issues."

### III.  ARGUMENT

**A.    Legal Standard.**

A party moving for summary judgment must first "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation omitted). This requires citing to "particular parts of materials in the record." *Wormuth v. Lammersville Union Sch. Dist.*, 305 F. Supp. 3d 1108, 1117 (E.D. Cal. 2018) (quoting FRCP 56(c)(1)). "If the moving party fails to meet its initial burden, summary judgment must be denied[.]" *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). If the burden is met, the nonmoving party may point to materials in the record to "establish the absence or presence of a genuine dispute."

Page 13  -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Id*. (citation omitted). The court must examine all evidence in the light most favorable to the non-moving party. *Porter v. California Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

**B.    City's Motion #1 Fails: RLUIPA Applies and the Ordinance Does Not Withstand Scrutiny.**

**1.    The Ordinance Imposes Individualized Assessments.**

The City contends that summary judgment should enter against Plaintiffs' first claim because the Ordinance does not satisfy 42 USC § 2000cc(a).  This is incorrect as a matter of law.

RLUIPA applies where a substantial burden on religious exercise (A) "is imposed in a program or activity that receives federal financial assistance"; (B) "affect[s] . . . commerce with foreign nations, among the several States, or with Indian tribes"; or (C) "is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved."  42 U.S.C. 2000cc(a)(2)(A)–(C).  Both subsections (B) and (C) apply here.

**a.    The Ordinance Implements an Individualized Assessment Regime.**

First, the plain language of 42 U.S.C. § 2000cc(a)(2)(C) makes clear that RLUIPA applies to land use regulations where a government "has in place formal or informal procedures or practices *that permit* the government to make[] individualized assessments of the proposed uses for the property involved."  42 U.S.C. § 2000cc(a)(2)(C) (emphasis added).  Actual denial of a conditional use permit application is not a condition precedent to RLUIPA jurisdiction, as the City suggests.  *See generally Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,* 218 F. Supp. 2d 1203, 1221 (C.D. Cal. 2002) (RLUIPA "codifies numerous precedents holding that systems of individualized assessments, as opposed to generally applicable laws, are subject to strict scrutiny"). When a land use code requires application for a permit that "results in a case-

Page 14  -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

by-case evaluation of the proposed activity of religious organizations," that is an "'individual

assessment' regime" under RLUIPA. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d

1214, 1225 (11th Cir. 2004). Such a regime enables officials "to use their authority to

individually evaluate and either approve or disapprove of churches and synagogues in potentially

discriminatory ways," and is subject to challenge even if a plaintiff has not applied for the

permit. *Id.* (challenge to CUP requirement was justiciable under RLUIPA even though plaintiffs

had not "follow[ed] procedures for obtaining" the permit).

There is no question that the Ordinance results in case-by-case evaluations of religious

activity. Applicants must describe their "benevolent meal services" and aver that they meet each

of the five "standards" for a benevolent meal CUP—including day and time restrictions. *See,

e.g.*, Sondag MSJ Dec. Ex. 16 at p. 1 (Brookings Nazarene application for "benevolent meal

served Saturdays 11-1"), p. 5 (Brookings Presbyterian application "serve one meal per week to

public from 12:00 pm to 1:00 pm"). The Ordinance authorizes City officials to evaluate whether

an entity is serving a "meal" to "the public" for "free," and whether such service is consistent

with its limitations. Indeed, that is precisely what the City did when it sent St. Tim's a notice to

abate its feeding ministry and other "social services" on April 14, 2023. Howard Dep. Ex. 18.

### b.    The Ordinance Is the Result of an Individualized Assessment.

Even if the Ordinance did not create an "'individualized assessment' regime" as

described above, subsection (C) still applies because there is no genuine dispute that the City

designed the Ordinance in response to an individualized assessment of St. Tim's.

RLUIPA jurisdiction exists if the government "design[s]" the challenged regulation "after

making an individualized assessment of the way that [the plaintiff] was using his property."

*Martin v. Houston*, 196 F. Supp. 3d 1258, 1265-66 (M.D. Ala. 2016). In *Martin,* an Alabama

pastor had offered transitional housing to recently released sex offenders on property adjacent to

Page 15   -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
                    JUDGMENT

his church for several years when the state adopted House Bill 556 ("HB 556"), which prohibited adult sex offenders from "establish[ing] residency in the same home" or near each other in the county where the ministry was located. *Id.* at 1261. Shortly before the act's effective date, the district attorney warned the pastor that his ministry was a public nuisance subject to fine under HB 556. *Id.* at 1266. The pastor filed claims under RLUIPA, the First Amendment, and the Due Process Clause.

Following a motion to dismiss, the court found allegations that HB 556 was specifically intended "force [the pastor] to disband his settlement" sufficient to state an individualized assessment under RLUIPA. *Id.* The district attorney's warning that the pastor's ministry was a public nuisance that would lead to fines if not abated required him "to apply the terms of the Act to the settlement as it existed on [the pastor's] property." *Id.*

There is no genuine dispute that, as in *Martin*, the City designed and applied the Ordinance in response to multiple individualized assessments of how St. Tim's used its property. Among them: (1) the City assessed St. Tim's' property use to determine it was a "restaurant," while developing a strategy that would allow the City to place restrictions on that use (*see* Plfs' MSJ at 9-10); (2) the City alleges it designed the Ordinance to respond to a petition about St. Tim's' property use (*see, e.g.,* Mot. at 9); and (3) the City made an individualized assessment that St. Tim's' use of its property qualified as an unpermitted "benevolent meal service" under the Ordinance and issued a Notice of Abatement. 42 U.S.C. § 2000cc(a)(2)(C) applies.

### c.    42 U.S.C. § 2000cc(a)(2)(B) Also Applies to the Ordinance.

The City argues that "[s]ubsection C is the only possibly applicable subsection" under § 2000cc(a)(2). In fact, subsection (B) separately sustains RLUIPA jurisdiction here because the Ordinance affects "commerce . . . among the several States." Although churches are non-profits, courts have recognized that they may "have a significant impact on interstate

commerce." *Cottonwood Christian Ctr.*, 218 F. Supp. 2d at 1221; *see also Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 354 (2d Cir. 2007) ("minimal effect on commerce" satisfies "jurisdictional element" of interstate commerce).

It is undisputed that St. Tim's invites members of a neighboring California church to join in its feeding ministry every Monday.  Lindley MSJ Dec. ¶ 6.  This activity impacts "use of interstate communications and transportation," bringing the burden that the Ordinance places on St. Tim's feeding ministry within the scope of 42 U.S.C. § 2000cc(a)(2)(B).  *Cottonwood Christian Ctr.*, 218 F. Supp. 2d at 1221 (quoting *United States v. Grassie*, 237 F.3d 1199, 1209 (10th Cir. 2001)).

      **d.**     **This Case Has Nothing to Do with an ORS Definition of "Restaurant."**

In arguing that Plaintiffs' claim is not cognizable under 42 U.S.C. § 2000cc(a)(2)(C), the City describes this case as concerning "what the State of Oregon[7] considers and defines by statute as a 'restaurant[.]'" Mot. at 19.  This is incorrect.  Plaintiffs challenge a City regulation that limits how they may serve the needy.  *See* Mot. at 12-13.  The ORS definition on which the City relies appears nowhere in the Complaint or the Code (and, as discussed above, does not support their argument).  Courts have rejected similar efforts to contort non-profit activities of religious entities into "commercial activities" as "dubious at best."  *See Micah's Way v. City of Santa Ana,* No. 823-cv-00183, 2023 WL 4680804, at *4 (C.D. Cal. June 8, 2023) (denying motion to dismiss RLUIPA claim and rejecting city's analogy of non-profit homeless services, including feeding ministry, to "administrative" or "commercial" activity under land use code).

---

[7] With respect to the State's view on meals served at churches, Governor Kotek stated through her spokesperson that she "is disappointed that local leaders in Brookings would limit free meal services that are clearly needed in their community . . . . The last thing we need are more barriers to helping Oregonians in need." *See* https://katu.com/news/politics/brookings-church-facing-fines-over-homeless-services-responds-to-governors-shelter-plan (last visited Nov. 11, 2023).

To the extent the definition of "restaurant" matters, it is its absence from the Code that is relevant to this case. The City has exploited that absence to declare that churches ("charitable organizations") that serve food in residential zones operate are restaurants. But country clubs, golf courses, nurseries, hospitals, nursing homes, and "public and quasi-public halls, lodges and clubs"—all conditional uses in residential zones with accessory meal service—are not. *See* BMC 17.20.040A, C, E, N, J. How the City decided that churches, which serve meals *for free*, are illegal restaurants without the Ordinance to "allow them," but bed & breakfasts, which serve meals *for profit*, are not, is confounding. BMC 17.20.040N. The City's discriminatory, individualized assessment is subject to RLUIPA.

**2.** **The Ordinance Substantially Burdens Plaintiffs' Religious Exercise.**

As explained in Plaintiffs' Motion, the undisputed facts leave no question that the Ordinance imposes a substantial burden on Plaintiffs' religious exercise. Plfs' MSJ at 17-21. The City argues otherwise based on three flawed arguments: (1) Plaintiffs' faith does not "require" that St. Tim's run its feeding ministry on church property or more than two days per week (Mot. at 24); (2) forcing St. Tim's to move its feeding ministry elsewhere is not a substantial burden (*id.* at 22-23); and (3) by feeding the hungry for free, St. Tim's is a restaurant (or was until the City made it a benevolent meal provider) and because restaurants are not permitted in residential zones, St. Tim's is simply suffering from a "self-imposed" burden (*id.* at 23-24).

**a.** **Religious Exercise.**

As a threshold matter, the City misstates the test for religious exercise under RLUIPA. The statute defines the term to include "any exercise of religion, *whether or not compelled by*, or *central to*, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). "The use . . . of real property for the purpose of religious exercise shall be considered to be religious exercise." 42 U.S.C. § 2000cc-5(7)(B).

0076396-00001

The City does not (and cannot) assert that feeding the hungry is <u>not</u> an exercise of Plaintiffs' Christian belief.  42 U.S.C. § 2000cc-5(7)(A).  It is.  *See* Sondag Opp. Dec. Exs. 6, 7, 12; Lindley Opp. Dec. Exs. 1-2; *see also* Lindley MSJ Dec. ¶¶ 2, 4, Ex. 1; Zellmer MSJ Dec. ¶¶ 5-7; Lindley Dep. 150:11-153:13; Akiyama Dep. 39:24-40:7; *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 729 (9th Cir. 2016) (unpublished) (homeless ministry, including feeding the hungry, was "integral part" of church's religion); *Michah's Way*, 2023 WL 4680804, at *5 ("food distribution activities are part of . . . religious exercise"); *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 544, 547 (D.D.C. 1994) (feeding the hungry "is a form of worship" that Christianity "mandates"; if "zoning regulations cannot be applied to ban prayer in a church, they cannot be used to exclude this type of religious activity"); *Chosen 300 Ministries, Inc. v. City of Phila.*, No. CIV.A. 12-3159, 2012 WL 3235317, at *16–17 (E.D. Pa. Aug. 9, 2012) ("Plaintiffs' practice of sharing food with the homeless and hungry is religious activity" under analogous state law).  Accordingly, the Court must construe the use of Plaintiffs' property for that purpose as "religious exercise."  42 U.S.C. § 2000cc-5(7)(B).

The City disagrees, arguing that nothing in Plaintiffs' "faith or religious tenets . . . *require[s]*" that they feed the hungry "at St. Timothy's and not elsewhere" or that such meals "be several times per week."  Mot. at 24 (emphasis added).  As discussed above, Plaintiffs disagree with this characterization of their faith.  But that dispute is irrelevant under RLUIPA, which expressly prohibits the Court from inquiring into whether Christianity "compels" Plaintiffs to practice their beliefs as they do. 42 U.S.C. § 2000cc-5(7)(A).  The Ninth Circuit is clear: "'[i]t is not within the judicial ken' to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"

*Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) (quoting *Hernandez v. Comm'r Internal Revenue*, 490 U.S. 680, 699 (1989)); *see also Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011) (it is not for the court to "inquire into the truth or falsity of stated religious beliefs"). As the Central District of California observed, when "food distribution" expresses "religious beliefs by rendering 'charitable services' to those in need," those activities fall within RLUIPA's scope. *Micah's Way*, 2023 WL 4680804, at *4. Whether such distribution is "merely incidental" to religious belief is an inquiry "prohibited by case law." *Id.* (collecting authority).

### b.    Substantial Burden.

Forcing St. Tim's to operate its feeding ministry from church property for only a few days per week (with a permit), or not at all (without one) is a substantial burden on Plaintiffs' religious exercise. A substantial burden is one that is "'oppressive to a significantly great extent,'" *Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 n.12 (9th Cir. 2006) (citation omitted), and "exists where the governmental authority puts substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Int'l Church*, 673 F.3d at 1067 (internal quotation marks and citation omitted).

As discussed, Plaintiffs sincerely believe that their faith calls them to feed the hungry and minister to their neighbors when the need exists. The COVID-19 pandemic laid bare that such need is not static. There is no genuine dispute that restricting Plaintiffs' ability to fulfill this call at their own place of worship by threatening $720 daily fines is a substantial burden on exercise of that faith. Howard Dep. Ex. 18. Courts have recognized that once a church is permitted "in a particular locality, the city must refrain, absent extraordinary circumstances, from in any way regulating what religious functions the church may conduct." *W. Presbyterian Church,* 862 F. Supp. at 546. To conclude that serving the hungry more than a set number of days per week is

not a "substantial burden" on Plaintiffs' religious exercise is tantamount to concluding that feeding the hungry when the need exists is "incidental" to their faith. *See Micah's Way,* 2023 WL 4680804, at \*4; *see also DiLaura v. Twp. of Ann Arbor*, 112 F. App'x 445, 446 (6th Cir. 2004) (unpublished) (refusing to allow religious ministry to run retreat for "contemplative prayer" unless they charged guests for meals violated RLUIPA).

Similarly, courts have rejected suggestions like the City's that regulations do not violate RLUIPA if there are other zones to which a ministry might relocate. The Ninth Circuit did so in *Harbor Missionary Church Corp.*, holding that forcing a church to relocate its homeless ministry was a substantial burden both economically and because the church's ministry could not "be divided piecemeal" when "keeping its homeless ministry as a whole at the same location" was important to church. 642 F. App'x at 729; *see also Jesus Center v. Farmington Hills Zoning Bd. of Appeals*, 215 Mich. App. 54, 544 N.W.2d 698, 704 (1996) (in RFRA challenge, holding that relocating homeless shelter from worship facility was a substantial burden economically and because "serving the homeless at the same location where The Jesus Center adherents worship their God" greatly facilitates religious ministry); *Congregation Etz Chaim v. City of Los Angeles*, No. CV10-1587 CAS EX, 2011 WL 12472550, at \*6 (C.D. Cal. July 11, 2011) (city's argument that relocation was not a substantial burden because the plaintiff congregation could possibly "find an alternative location" was "not compelling").

None of the City's cited authority supports its position that the Ordinance is not substantially burdensome. *San Jose Christian College v. City of Morgan Hill* concerned a city's refusal to re-zone a property to allow for a Christian college in a hospital-only zone. 360 F.3d 1024, 1034 (9th Cir. 2004); Mot. at 22. City staff denied the application because the plaintiff did not provide required information, such as whether students would reside on site. *Id.* at 1029.

The court found no substantial burden because the relevant regulation "impose[d] no restriction whatsoever on [plaintiff's] religious exercise; it merely requires [plaintiff] to submit a *complete* application" and, separately, "there [was] no evidence in the record demonstrating that College was precluded from using other sites within the city." *Id.* at 1035. Here, by contrast, the Ordinance restricts religious exercise on its face and would necessitate relocation of a non-profit ministry for the poor that is already present at 401 Fir Street. This is not a facially neutral land use regulation requiring potential reconsideration of plans for a college. The burdens are not remotely similar.

Likewise, *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (*see* Mot. at 22), concerned efforts *initiated by the plaintiff churches* to move from their existing spaces to new Chicago locations. This is, of course, not the case here: St. Tim's wants to continue ministering at its current property. Regardless, the Ninth Circuit **expressly rejected** the Seventh Circuit's holding in *Urban Believers*:

> The City, citing *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752 (7th Cir.2003), argues that just because suitable properties are not available for sale on the market does not mean that the denial of the Church's desired site imposes a substantial burden . . . . **We are not persuaded by this case for several reasons**. For one thing, *Civil Liberties for Urban Believers* was decided in a circuit that requires a government action to render 'religious exercise . . . effectively impracticable' in order to qualify as a substantial burden under RLUIPA. *Id.* at 761. This higher standard has been rejected in this circuit. *See Guru Nanak*, 456 F.3d at 989 n. 12.

*Int'l Church*, 673 F.3d at 1068-69 (emphasis added). The Ninth Circuit also noted that a subsequent Seventh Circuit decision at the very least limited (if not overruled) *Civil Liberties*. *Id.* (discussing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 901 (7th Cir. 2005)).[8]

---

[8] The same Ninth Circuit analysis applies to an even earlier Seventh Circuit decision on which the City relies, *Love Church v. City of Evanston*, 896 F.2d 1082 (7th Cir. 1990), which concerned a 14th Amendment challenge by a plaintiff church that initiated a relocation effort. Mot. at 22.

Page 22   -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The City's other authority is equally unpersuasive.  *See Midrash Sephardi Inc.*, 366 F.3d at 1234-45 (no substantial burden where synagogues elected to locate in areas where pre-existing zoning code prohibited synagogues, but finding that code violated RLUIPA's equal terms provision); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006)[9] (denying church's request to *begin* operating 100-child daycare center in a residential zone, and analyzing only "religious exercise," not substantial burden); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303 (6th Cir. 1983) (in superseded pre-RFRA and pre-RLUIPA case, no First Amendment violation where religious organization denied approval to construct a new church); *Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691 (E.D. Mich. 2004) (no substantial burden where commission denied application to religious center *seeking to demolish its building* and construct a new one).

Finally, even if the availability of an alternative location were relevant, the record is clear: there is nothing feasible to replace St. Tim's' current property, which has a licensed "commercial kitchen" it has been using for decades. St. Tim's is a non-profit congregation in a non-profit Diocese, whose COVID-19 grant funding was restricted to its COVID clinic. *See* Van Meter Dec. Ex. B (Akiyama Tr. at 21:4-8); Sondag Opp. Dec. Ex. 9 at 13. The former Mayor himself was unable to locate alternative space when he looked several years ago and then again in 2022.  Lindley Dep. 112:17-113:18, 114:23-115:11; Hedenskog Dep. 12:1-3, 79:16-82:1; Sondag MSJ Dec. Ex. 18 (Aug. 30, 2021 Tr. 59:17-60:1).

### 3.    The Ordinance Is a Burden Imposed by the City.

The City's gesture to a "self-imposed" burden is quickly dismissed. *See* Mot. at 23.  The "self-imposed burden" inquiry, which the Motion never clearly articulates, is whether "a

---

[9] The City mischaracterizes *Grace Church* as a Ninth Circuit opinion.  Mot. at 22.

religious group has imposed a burden upon itself by acquiring a property whose use is already restricted." *New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596, 602 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) (Mot. at 23); *see also Spirit of Aloha Temple v. Cnty. of Maui*, 322 F. Supp. 3d 1051, 1065 (D. Haw. 2018) (self-imposed burden when applicant purchased land "knowing that it was zoned for agricultural and conservation use") (Mot. at 23).

Plaintiffs have owned the property at 401 Fir Street since 1953. It is undisputed that Brookings did not even have a land use code to "restrict" the use of this property at that time. Mot. at 12. The "self-imposed burden" test, which the Ninth Circuit has not even embraced (*New Harvest*, 29 F.4th at 602 (declining to adopt "bright-line rule")), is beside the point.

### 4. The Ordinance Was Not the Least Restrictive Means to Achieve Any Compelling Government Interest.

The City bears the burden of proving that the Ordinance is the least restrictive means of satisfying a compelling government interest. *Int'l Church*, 673 F.3d at 1066-67; 42 U.S.C. § 2000cc-2(b). The City cannot satisfy this burden by "rely[ing] on 'broadly formulated' governmental interests"; it must provide a "specific application" of the asserted interest and regulation to the community at hand. *Mast v. Fillmore Cnty., Minn.*, 141 S. Ct. 2430, 2432 (2021) (Gorsuch, J. concurring); *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).

The City's entire articulation of its compelling government interest is as follows:

> There is no dispute that "public safety and welfare" is a compelling government interest. Courts generally recognize that governments have a legitimate purpose in "the promotion of public health, safety, and general welfare of [its] citizens." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006). The Ninth Circuit has held that municipalities have a compelling interest "in promoting public safety and in preventing crime." *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 730 (9th Cir. 2016). *Here, the City's adoption of the Ordinance arose from public safety and welfare concerns, specifically the desire to continue provision of benevolent meal services*.

Page 24 - PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Mot. at 24 (emphasis added).  This fails as a matter of law.

Vague references to broadly formulated interests like "public safety and welfare," "public health," and "preventing crime" are "broadly formulated" interests that RLUIPA does not tolerate.  As detailed in Plaintiffs' Motion (p. 21-28), binding authority prohibits a finding of compelling government interest on such generalities.  *See, e.g., Mast*, 141 S. Ct. at 2432 (Gorsuch, J. concurring) ("*general* interest in sanitation regulations" were not compelling under RLUIPA "without reference to the *specific* application of those rules to *this* community").[10] Moreover, even with a "specific application," the interests do not check out: there is no evidence that Plaintiffs' feeding ministry harms public safety or that it is not healthful (to the contrary, it is an OHA permitted commercial kitchen that routinely passes inspection). *See* p. 11, *supra.* And there can be no reasonable dispute that providing free meals *serves* the public welfare.

Indeed, the City appears to concede as much, stating that the "continue[d] provision of benevolent meal services" *is* a "public safety and welfare" concern. Mot. at 24.  By *limiting* provision of those very meals, the Ordinance by definition undermines that interest. Under these circumstances, the City has failed to articulate any compelling government interest as a matter of law.  *See Fulton*, 141 S. Ct. at 1881-82 (city's stated interest in maximizing number of foster parents did not withstand strict scrutiny when city had refused to contract with Catholic foster agency—an action that would have "increase[d], not reduce[d], the number of available foster parents").  Here, if the City desired "continue[d] provision of benevolent meal services," as it claims (Mot. at 24), it needed to do nothing more than get out of its own way and allow Plaintiffs

---

[10] On remand, the Minnesota Court of Appeals held the city's alleged interest in "protecting the county's water from harmful pathogens and pollutants" was not compelling because there was no evidence of existing harm.  *Mast v. Cnty. of Fillmore*, 993 N.W.2d 895, 904 (Minn. Ct. App. 2023), *rev. granted* (Oct. 17, 2023).

to continue their ministry.  <u>That</u> was the least restrictive means to satisfy those interests.

The suggestion that Plaintiffs "could not lawfully engage" in this ministry before the Ordinance, and that without the Ordinance all benevolent meal services must end, is dangerously close to frivolous.  Mot. at 25-26.  The *City* makes the threshold determination of what is or is not lawful under its code.  The *City* decided in 2020 and 2021 to re-interpret that code to place conditions on churches' meal service, but not other conditional uses in residential zones that involve food service.[11]  The *City* adopted the Ordinance.  The *City* sent St. Tim's a notice threatening $720 daily fines for serving "benevolent meals" and offering other "social services."  Howard Dep. Ex. 18.  This very week, in response to this litigation, the *City* considered arbitrarily changing the Ordinance to serve its litigation interest.  Sondag Opp. Dec. ¶ 5.  If services to the homeless in Brookings come to an end, it will be at the City's behest.

**C.    City's Motion #2 Fails: The Ordinance Violates the Free Exercise Clause.**

The City incorrectly asserts that summary judgment should be entered against Plaintiffs' Free Exercise claim because the Ordinance is neutral and generally applicable and survives rational basis review.  Mot. at 26-27.

As detailed in Plaintiffs' Motion, the Ordinance is not neutral and it is not generally applicable.  Plfs' MSJ at 30-35.  The legislative record and the City's selective enforcement leave no question that the Ordinance's "object or purpose . . . is the suppression of religion or religious conduct"—that is, feeding the hungry and serving the poor.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The City expressly crafted the Ordinance

---

[11]  As described in Plaintiffs' Motion, when a government "suddenly burst[s] into action" after being "complacent" about a subject for many years, its purported concerns "ring[] hollow." *Cottonwood*, 218 F. Supp. 2d at 1225, 1228; *see also Grace Church*, 555 F. Supp. 2d at 1140-41 ("One way to evaluate a claim of compelling interest is to consider whether in the past the governmental actor has consistently and vigorously protected that interest.")

in response to St. Tim's' ministry and intended it to apply to "churches."  Howard Dep. Ex. 3 at

3, Ex. 6 at 14, 7, Ex. 8 at 2.  The legislative history also reveals impermissible "hostility"

towards Plaintiffs' religious practice.  Sondag MSJ Dec. Ex. 22 at 3; Hedenskog Dep. Ex. 26 at

2; Schreiber Dep. 135:3-12, 136:2-139:17.  And the Ordinance selectively imposes burdens only

on conduct motivated by religious belief.  The same hours and day limitations are not imposed

on secular bed and breakfasts, lodges, and clubs. *See* BMC 17.20.040A, C, E, N, J.  Accordingly,

the Ordinance is subject to strict scrutiny, which it cannot withstand.  *Supra* at p. 24-25; *see also*

Plfs' MSJ at 21-30, 35.

        Even if rational basis review applied, as the City contends, Mot. at 27, the Ordinance is

still unconstitutional because it is not rationally related to any legitimate government purpose.

As discussed above, the Ordinance does not serve the purpose of "continu[ing] provision of

benevolent meal services," it does the *opposite*.  The action rationally related to continuing these

meals was, in fact, to continue them as church uses—not manufacture a limitation in the Code.

        No other "conceivable basis" supports the Ordinance.  *See* Plfs' MSJ at 21-30.  The City

ostensibly drafted it to respond to neighborhood concerns about Rule 2020-1, which was

unrelated to St. Tim's' meal service.  Howard Dep. Ex. 3 at 4.  The 2020 Incident Reports make

clear that St. Tim's meal service was not a threat to "public safety" or a source of "crime."

Sondag Opp. Dec. ¶¶ 12, 13, Ex. 10.  The legislative record—up through *this week*—makes

clear that the "number of days and times" the City selected was entirely arbitrary.  Sondag Opp.

Dec. Exs. 2, 3, 7 (Tr. 20:2-21:11).  And "limiting the number of days and times" that people may

receive meals without charge *harms* rather than *serves* the public welfare.  Indeed, when a

private religious congregation "happens to provide, at no cost to the city, a sorely needed social

service" it is simply "paradoxical that local authorities would attempt to impede such a

worthwhile effort." *W. Presbyterian Church*, 862 F. Supp. at 546-47.  Under any standard of review, the Ordinance does not pass constitutional muster.

**D.      City's Motion #3 Fails: The Ordinance Prohibits Expressive Conduct.**

The City's challenge to Plaintiffs' Free Speech and Association claim rests on arguments that St. Tim's' feeding ministry is not expressive conduct and that the Ordinance does not restrict speech, expression, or association.  Both miss the mark.

First, the feeding ministry is expressive conduct.  "[T]he Constitution looks beyond written or spoken words as mediums of expression." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 569 (1995).  Thus, "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments,'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation omitted); a "'particularized message'" is not required, *Hurley*, 515 U.S. at 569 (citation omitted).  Instead, courts examine whether conduct was intended to be communicative and whether viewers, in context, would understand it to be communicative.  *Johnson*, 491 U.S. at 404.

Under this framework, courts have recognized that a wide array of conduct is expressive. This includes "religious worship and discussion," which are "well established . . . forms of speech and association protected by the First Amendment." *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1277-78 (10th Cir. 1996); *see also Widmar v. Vincent*, 454 U.S. 263, 269 (1981)). Similarly, the First Amendment protects the act of gathering to carry out expressive acts.  *Santopietro v. Howell*, 73 F.4th 1016, 1025 (9th Cir. 2023) ("Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends" (brackets, internal quotation marks and citation omitted)); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66 (1991) (nude dancing); *Johnson*, 491 U.S. at 405-06 (burning American flag);

Page 28   -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Brown v. State of Louisiana*, 383 U.S. 131, 141-42 (1966) (staging silent sit-in).

St. Tim's' feeding ministry plainly communicates key aspects of its theological beliefs, including the importance of feeding the hungry and respecting the dignity of human life. It provides a place for parishioners and neighbors to gather and discuss topics including but not limited to their faith. Plfs' MSJ at 39; Lindley MSJ Dec. ¶ 8. The City disagrees, comparing St. Tim's' feeding ministry to a McDonald's drive-thru. Mot. at 28. The attenuated analogy ignores the ministry's intent: an analysis central to the First Amendment inquiry. *See Johnson*, 491 U.S. at 404 (intent behind act is relevant to determining whether it is communicative); *see also W. Presbyterian Church*, 862 F. Supp. at 547 (feeding the hungry is "akin to prayer"). There is no question that the feeding ministry is expressive conduct.

Second, the Ordinance is a quintessential example of a content-based time, place, and manner restriction. Its plain terms restrict the time, place, and manner in which Brookings churchgoers can gather, discuss their faith, and provide meals without charge in residential zones.[12] As discussed above, the record is clear that the Ordinance was adopted for the sole purpose of restricting previously unrestricted meal service at churches—particularly St. Tim's— due to the City's newfound disagreement with this expressive conduct. As a result, the Ordinance presumptively violates the First Amendment, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986), and is subject to strict scrutiny to "ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.'" *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980) (citation omitted); *see also Johnson*, 491 U.S. at 412. As

---

[12] Again, the City's attempt to recast the Ordinance as creating a right that did not previously exist falls flat. For decades, St. Tim's' provided food to the needy from its current location without objection from the City.

Page 29  -  PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

discussed above and in Plaintiffs' Motion (p. 23-30), the Ordinance falls short of this exacting

standard.

Indeed, even if the Ordinance were content-neutral—in other words, if the City had not

passed the Ordinance with the intent of targeting church meal services—it would fail

intermediate scrutiny for similar reasons. *Ward*, 491 U.S. at 791 (applying intermediate scrutiny

to content-neutral time, place, manner restriction); *see also Johnson*, 491 U.S. at 403. The City

offers *no* evidence that the Ordinance advances its proffered interests. *See Cornerstone Bible*

*Church v. City of Hastings*, 948 F.2d 464, 469 (8th Cir. 1991) (government bears burden of

providing factual support for claim that restriction advances stated goals); *supra* at 24-25. And

the City's suggestion that Plaintiffs—non-profit organizations and a vicar—should abandon their

current kitchen facility to pay to rent or buy a new one in a commercial zone (space which the

City itself has been unable to find) demonstrates that the Ordinance leaves St. Tim's without

alternative channels. *See* Lindley Dep. 112:11-113:7; *Ward*, 491 U.S. at 791 (content-neutral

time, place, manner restriction must leave open ample alternative channels of communication).

The Ordinance violates St. Tim's expression and association rights under any standard of review.

**E.    City's Motion #4 Fails: The Ordinance Is Unconstitutionally Vague and Overbroad.**

The Ordinance is unconstitutionally vague on its face and as applied to Plaintiffs because

it does not sufficiently define regulated conduct and opens the door to arbitrary enforcement.

*See* Plfs' MSJ at 35-38. The definition of "benevolent meal service"—that is, "periodic food

service operation that provides food to the public without charge"—provides inadequate

guidance to both the regulated and the regulators. *Id.* at 36-37. In arguing otherwise, the City

offers dictionary definitions that do nothing to explain away the ambiguity of the Ordinance.

Mot. at 30 (defining "periodic" and "public"). What frequency of meal service qualifies as

"occurring or recurring at regular intervals"? If "public" "relat[es] to people in general," (*id.*)

does communion service, which is open to anyone, qualify for regulation?[13]  Or is communion part of "normal church services," which the former Mayor explained the Ordinance is not intended to disrupt?  *See* Plfs' MSJ at 37.  And if Plaintiffs consider their diners to be guests, does that differentiate them from the general "public"?  The absence of adequate definition for these terms chills protected activity and invites arbitrary enforcement; indeed, the City has already selectively applied the Ordinance to Plaintiffs.  *Id.* at 34.

The City's reliance on Fr. Bernie's interpretation does nothing to detract from these concerns.  As a threshold matter, the City improperly focuses on his personal understanding of "benevolent meal service," *not* its challenged definition—specifically, the terms "food service operation," "provides food," "periodic," "to the public."  Mot. at 30-31.  More fundamentally, the City does not identify any case suggesting that a plaintiff's *subjective* interpretation defeats a vagueness challenge, which is an *objective* test.  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

In any event, Fr. Bernie's interpretation of "benevolent meal service" validates Plaintiffs' concern about the Ordinance's lack of specificity.  He repeatedly testified to his understanding that the Ordinance **restricts church meal services**, which he refers to as soup kitchens.  Lindley Supp. Dep. 124:3-125:11; 152:14-25. Fr. Bernie's interpretation tying benevolent meals to religious worship sharply contrasts with the City's stated position that the Ordinance is an expansion, rather than restriction, of rights that apply equally to secular and religious institutions. The divergence underscores how the Ordinance risks arbitrary, selective enforcement and a chilling effect on constitutionally protected activity.

---

[13] Not according to the City Manager and former Mayor.  Howard Dep. 90:10-24; Hedenskog Dep. 60:3-62:2.

Page 31   -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Ordinance's significant restriction of core First Amendment activities also renders it unconstitutionally overbroad.  A statute is overbroad if there exists a substantial risk that its application will suppress speech.  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).  A law is impermissibly overbroad if a substantial number of its applications are unconstitutional in relation to any plainly legitimate sweep; in other words, "where a sufficient imbalance exists" between its unconstitutional applications and its legitimate ones.  *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012) (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)).  Here, the Ordinance's broad language fails to focus its application on unprotected activity; indeed, it was drafted specifically *to apply to* protected activity (without any compelling or substantial government interest). To this day, the City has not articulated or applied the Ordinance in a manner that does *not* restrict a substantial amount of protected activity.

**F.     City's Motion #5 Fails: The Ordinance Violates Article I, Sections 2 and 3 of the Oregon Constitution.**

**1.     The Ordinance Does Not Withstand Exacting Scrutiny.**

The City applies to the wrong test in asserting that the Ordinance complies with the Oregon Constitution.  Because the Ordinance is not generally applicable and neutral, the question is not, as the City suggests, "whether there was 'statutory authority to make such a regulation,' or whether [the court] should grant 'an individual claim to exemption on religious grounds.'"  Mot. at 35 (quoting *State v. Hickman*, 358 Or. 1, 15-16, 358 P.3d 987 (2015)).

Here, the history and enforcement of the Ordinance, described above and in Plaintiffs' Motion, makes clear that its purpose is to control or interfere with Plaintiffs' feeding ministry, which is an expression of religious belief.  As a result, *exacting scrutiny* applies "to ensure that [the Ordinance] comport[s] with the commands of Article I, sections 2 and 3."  *Hickman*, 358 Or. at 15.  Under these sections, the "'state may [only] justify a limitation on religion by showing

that it is essential to accomplish an overriding governmental interest," *Emp. Div. v. Rogue Valley Youth for Christ*, 307 Or. 490, 498, 770 P.2d 588 (1989), and a law is not essential unless it is the least restrictive means available. *State ex rel. Juvenile Dep't of Polk Cnty. v. Tucker*, 83 Or. App. 330, 334, 731 P.2d 1051 (1987).

The Ordinance does not withstand exacting scrutiny because it impermissibly limits Plaintiffs' right to freely exercise their religion by restricting their ability to operate the feeding ministry and serve those in need. The City has not identified *any* "overriding" interest, let alone shown that the Ordinance was the least restrictive means to advance it.

### 2.    Plaintiffs' Challenge is not to Zoning Laws in General.

The City cites several cases for the proposition that "zoning laws and permit requirements can be applied to churches." Mot. at 36. Plaintiffs do not dispute this; their claims are not to zoning laws generally. [14] Plaintiffs challenge a *specific* law that restricts Plaintiffs' religious practice because the City believes it attracts "needy and homeless persons." Mot. at 9. The Ordinance is not akin to the application of a neutral zoning code to deny a building permit because a proposed church construction would "unreasonably increase traffic congestion." Mot. at 35 (citing *Milwaukie Co. of Jehovah's Witnesses v. Mullen*, 214 Or. 281 (1958)). Traffic congestion is not a sincerely held religious belief; serving the needy and the homeless is.

Moreover, as the City itself admits, Plaintiffs' exercise of their religious belief *serves* rather than harms the public welfare. Mot. at 34. Thus, the City's reliance on *Baer v. City of*

---

[14] Again, the City's bald assertion that "Fr. Lindley and Bishop Akiyama both admit their objection to Ordinance #21-O-795 is that it requires a permit at all" (Mot. at 29) is a gross mischaracterization of the record. It bears repeating: Fr. Bernie cannot both "object[] to any permit" and also "previously [have] applied for" permits for "for worship building expansion," "car camping," and a "commercial kitchen" for St. Tim's. Mot. at 39. And Bishop Akiyama testified at deposition that "generally speaking" it *is* "okay for cities to require permits of congregations within the Diocese." Van Meter Decl., Ex. B (Akiyama Dep. 52:22-53:16).

*Bend*, 206 Or. 221, 223 (1956), where a church objected to a water fluoridation program, is

misplaced. Mot. at 38. There is no argument here, as there was in *Baer,* that Plaintiffs' religious

belief (feeding meals to those in need) impedes the public welfare. Nor does the restriction on

Plaintiffs' feeding ministry "bear[] only remotely" on their religious practice, as was the case in

*Baer.* 206 Or. at 235-36. Article I, sections 2 and 3 do not tolerate the City's actions.

**G.    City's Motion #6 Fails: The Ordinance Violates Article I, Section 8 of the Oregon Constitution.**

The City's Motion #6 proceeds from two incorrect assumptions: that the proper standard

for review of Plaintiffs' Article I, Section 8 claim is *Robertson* category 3 (*see State v.

Robertson*, 293 Or. 402, 412 (1982)), and that, even if it were, the Ordinance satisfies the

applicable constitutional requirements.

The Ordinance should be analyzed under the first *Robertson* category, not the third.

*Contra* Mot. at 39. The first category applies to laws that focus on the content of speech or

writing, including laws directed at "any mode of 'expression.'" *State v. Ciancanelli*, 339 Or.

282, 292 (2005). Expression is not limited to words; it includes, for example, "nonverbal

'artistic' forms of expression like painting, photography, and dance . . . designed to convey

something about the communicator's world view," as well as "physical acts, such as nude

dancing or other explicit sexual conduct, that have an expressive component." *Id*. at 293, 311.

As discussed, Plaintiffs' feeding ministry has a strong expressive component and

therefore should be analyzed under the first *Robertson* category. *See supra*; Plfs' MSJ at 41-42.

Under the first *Robertson* category, a law is "facially unconstitutional 'unless the scope of the

restraint is wholly confined within some historical exception that was well established when the

first American guarantees of freedom of expression were adopted." *State v. Rich*, 218 Or. App.

642, 646 (quoting *State v. Robertson*, 293 Or. 402, 412 (1982)). No such exception exists in

Page 34  -   PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

relation to the Ordinance.

Second, even if the third *Robertson* category applied, the Ordinance is still unconstitutional as applied to Plaintiffs' feeding ministry. The constitutionality of a law under the third *Robertson* category depends on whether the law places reasonable restrictions on the time, place, and manner of the expression. *State v. Babson*, 355 Or. 383, 407 (2014). To determine whether time, place, and manner restrictions are reasonable, courts consider three factors: "(1) whether the law discriminated on the basis of the subject or content of the speech or effectively *prohibited* certain forms of speech while allowing nonexpressive conduct; (2) whether the restriction advanced a legitimate state interest without restricting substantially more speech than necessary; and (3) whether there were ample avenues to communicate the individual's message despite the law's restrictions." *Id*.

Here, all three factors weigh against constitutionality. As discussed, the Ordinance was enacted to regulate church meal programs—St. Tim's' in particular—while allowing secular institutions to operate as before. Moreover, the City cannot show that the Ordinance "advances" its purported interests in public safety, welfare, and peace and order. *Supra* at 24-28; Plfs' MSJ at 21-28. Finally, as discussed, Plaintiffs lack alternative avenues for their protected expressions of faith through their feeding ministry. Their existing church serves Plaintiffs' need to gather in prayer and ministry, as it has for many decades.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny the City's Motion.

DATED:  November 17, 2023.

STOEL RIVES LLP

*s/ Samantha K. Sondag*
Amy Edwards, OSB No. 012492
amy.edwards@stoel.com
Samantha K. Sondag, OSB No. 154244
samantha.sondag@stoel.com
Rachelle D. Collins, OSB No. 214059
rachelle.collins@stoel.com
Telephone:  503.224.3380

Attorneys for Plaintiffs